[No. 12304.   Department One.   May 4, 1915.]

J. J. CORNWALL, *Respondent,* v. F. W. ANDERSON *et al.,*
*Appellants.*

E. P. POLLAND, *Respondent,* v. F. W. ANDERSON *et al.,*
*Appellants.*[1]

APPEAL AND ERROR—REVIEW—QUESTIONS OF FACT—FINDINGS. Upon
a trial *de novo* on appeal, it is the duty of the supreme court to
carefully examine and weigh the conflicting evidence before the
trial court, and to sustain or reverse the findings in accordance with
the clear preponderance of the evidence.

BILLS AND NOTES — DURESS — SUFFICIENCY OF EVIDENCE. Duress
sufficient to coerce defendants into the execution of promissory notes
is not established by evidence that defendants were men in the
prime of life, of business experience and mentally competent, that
the negotiations were under way for some time ·after plaintiffs had
threatened a receivership and a criminal prosecution, and defend-
ants never sought legal advice, and the notes were not repudiated
until about due date, six and one-half months later; the controlling
test being the condition of the mind of the wronged party at the
time, his state of health, condition in life, experience, education and
intelligence.

BILLS AND NOTES—DURESS—WHAT CONSTITUTES. The obtaining of
promissory notes by threats of litigation and of criminal prosecu-
tion would not constitute legal duress, where the threats were merely
of prosecution at some indefinite time, and there was no restraint
imminent at the time of signing the notes that could be considered
as constraining the mind of an ordinary person.

Appeal from a judgment of the superior court for Spo-
kane county, Sullivan, J., entered April 7, 1914, upon find-
ings in favor of the plaintiffs, in consolidated actions on
promissory notes, tried to the court.   Affirmed.

*Hurn & Hurn,* for appellant Anderson.

*Graves, Kizer & Graves,* for respondents.

HOLCOMB, J.—By stipulation between the parties, the
appeals in these two cases have been heard as one appeal.

[1]Reported in 148 Pac. 1.

Each of the actions is a suit upon a promissory note in favor of the plaintiff and respondent, signed by W. W. Scott and appellants D. Moylan and F. W. Anderson. The appellants defended separately, being represented by different counsel, but their defense was the same and rested upon the same state of facts. By stipulation the actions were consolidated for trial and tried to the court without a jury. Scott was not made a party to either action. The defense of the appellants was duress. The facts in the cases are these:

Anderson is a man forty-four years of age and, since he was about twenty years old, has been a banker and money loaner. From 1901 to 1914 he lived at Davenport, Washington, and was cashier and the principal stockholder of the Lincoln County State Bank, owning $38,000 of its $50,000 capital stock. In 1914, he removed from Davenport to Spokane, where he is engaged in the mortgage and loan business. Appellant Moylan was engaged in the livery business in Davenport for a number of years, and prior to that was a farmer in that vicinity, but removed therefrom to Spokane and is there engaged in the livery business. In 1910, Moylan, together with one Sommers, organized a domestic corporation with a capital stock of one million shares of the par value of one dollar each, naming it the Washington & California Investment Company, in which Anderson and Scott became original subscribers to stock, and the four named composed the original board of trustees of the corporation. Scott was made president and Anderson secretary and treasurer. The stock was nominally subscribed for by Scott, Sommers, and Moylan, and the money required for the company's operations to commence business was raised by a loan made by Anderson.

There is a great mass of testimony in the record as to how Moylan, Scott and Sommers conducted an energetic campaign for the sale of stock among the farmers about Davenport, most of which is immaterial. The plan adopted, however, was that the stock should be sold in blocks of two

thousand shares, together with ten acres of the company's
California lands, for $2,000 per block, $500 payable in
cash, the remainder in three equal annual installments. Each
sale was evidenced by a contract, whereby the company un-
dertook to convey the two thousand shares of stock and a
specifically described ten-acre tract of realty upon the mak-
ing of the payments therein provided. Each of these con-
tracts was referred to as a "share" in the company. Ander-
son took no active part in the selling. In several instances,
intending purchasers went to him for advice as to the ad-
visability of purchasing, and he sometimes gave his opinion
as to the prospects of the company. Among the purchasers
of "shares" were the respondents Polland and Cornwall, who
not only bought several blocks of stock from the company,
but also acquired other contracts from other purchasers of
the company.

About the latter part of 1912, some dissatisfaction arose
among some of the stockholders as to the affairs and man-
agement of the company. Scott and a man named Snyder
had been placed in charge of the property in California. It
was discovered that the land which the company had con-
tracted to sell to the individual stockholders with the stock—
that is, the ten-acre tracts, had been sold to other persons
who had taken possession of it, and that portions of the land
which had been represented as being owned by the company
were held only under a contract of purchase and that por-
tions of this had been declared forfeited because of the com-
pany's default in payment. Scott's management was criti-
cised, among other reasons, because he was not accounting
for all the income realized from the property. Polland and
Smith had both gone to California late in 1912, to investi-
gate the condition and affairs of the company for them-
selves. Returning early in 1913, they went to see Anderson
concerning the situation. On February 5, they had a con-
versation with him in Davenport and, at his request, met him
the next day in Spokane, together with Moylan, where an-

other conversation was had, the result of which was that an agreement was made whereby Smith, Cornwall and Polland agreed to sell to Moylan and Anderson sixteen shares of the stock in the corporation for the sum of $1,170 a share, payment to be made on or before thirty days from date in case a deal then pending on what was called the Reid ranch was closed. In case of failure to close the Reid deal inside of thirty days, the contract was to be null and void. The Reid ranch was a tract of about six thousand acres owned by the company, a sale of which was then pending, and which all persons concerned believed would be consummated and which would net a handsome profit for the company. A sale of the Reid ranch was not closed in thirty days, and the performance of the contract was, by agreement between respondents, Smith, and appellants, extended for another thirty days. Polland and Smith made another trip to California and returned about the 1st of April.

On the 12th of April, the parties again met in Spokane at the Victoria Hotel, and Polland and Smith then insisted that $500 should be added to the amount which they had theretofore agreed should be paid to them of $1,170 per share or block, for the time and expense of their second trip to California, which they claimed was because of the fault of Anderson and Moylan. They were in conference at intervals for two days, and the result of the conference was that Anderson and Moylan executed the notes now sued upon on April 14, 1913. The notes, after being signed by Anderson and Moylan, were sent to Scott in California for his signature. Scott signed the notes and returned them on April 22, and thereupon the assignments of the share contracts were made and placed in escrow with Freece & Pettyjohn, a firm of lawyers in Davenport, for delivery when certain conditions had been complied with. The notes fell due November 1, 1913. Anderson did not claim that anything was wrong with the transaction or make any objection to the validity of the notes until October 20, 1913, when he notified

respondents he did not intend to pay them. Moylan made no effort to invalidate his notes until he made his answer in these cases. He says that, when he made the notes, he intended to pay them.

The answers of the appellants are substantially the same in both cases, and set up the defense of duress by threatening each of the appellants with arrest on prosecution on a false criminal charge unless he executed the notes; and also by unlawful confederation and conspiracy to falsely accuse appellant of a crime and threatening his prosecution and arrest for the purpose of compelling him against his will to buy certain stock owned by respondents in the Washington-California Investment Company, at a price fixed by them which was more than double its real value, and execute the notes sued on therefor; and that, solely by reason thereof, each appellant executed said notes, and that said notes are without consideration.

The evidence to the issue tendered by the appellants was almost wholly of interested parties as witnesses, and is to some extent conflicting. The trial court had the advantage of seeing and hearing the witnesses and judging of their demeanor upon the stand. The trial court found that the appellants executed the notes freely and voluntarily, and that in doing so they were not acting under duress. The respondents insist that we are concluded upon this finding of the trial court, by reason of the fact that this court has so frequently held that the decision of a trial judge based upon conflicting testimony will not be disturbed unless palpably contrary to the weight of the evidence. But it is also true that, in a case tried to the court without a jury, this court is compelled to try the case *de novo;* and as was said in *Borde v. Kingsley,* 76 Wash. 613, 136 Pac. 1172, this court will sustain the findings and judgment of the trial court when, and when only, we can say that we are satisfied that the evidence does not preponderate against the findings. To the same effect see: *Baker v. Yakima Valley Canal Co.,* 77

Wash. 70, 137 Pac. 342; *Zizich v. Holman Security Inv. Co.*, 77 Wash. 392, 137 Pac. 1028, 139 Pac. 57; *Johnsen v. Johnsen*, 78 Wash. 423, 139 Pac. 189; *Mueller v. Vancouver*, 81 Wash. 384, 142 Pac. 868; *Becker v. Clark*, 83 Wash. 37, 145 Pac. 65.

We have felt impelled, therefore, to make a painstaking and careful examination of the evidence in this case in order to ascertain whether or not the evidence clearly preponderates against the trial court's findings. Upon the question of duress as a question of law, the appellants insist that the liberal rule applied by the modern authorities should be applied in this case, to the effect that the real test is "that if one party to a transaction is prevented from exercising his free will by reason of threats made by the other, to the end that he may obtain such contract, the person under restraint may at his option repudiate such contract on the ground of duress. It is the condition of the mind of the wronged party at the time of the acts sought to be avoided that is controlling;" citing *Galusha v. Sherman*, 105 Wis. 263, 81 N. W. 495; *Callender Savings Bank v. Loos*, 142 Iowa 1, 120 N. W. 317; *Kaus v. Gracey*, 162 Iowa 671, 144 N. W. 625; *Joannin v. Ogilvie*, 49 Minn. 564, 52 N. W. 217, 32 Am. St. 581, 16 L. R. A. 376; *Price v. Bank of Poynette*, 144 Wis. 190, 128 N. W. 895; *McCarthy v. Taniska*, 84 Conn. 377, 80 Atl. 84; *Nebraska Mut. Bond Assn. v. Klee*, 70 Neb. 383, 97 N. W. 476; *Parmentier v. Pater*, 13 Ore. 121, 9 Pac. 59; *Wilbur v. Blanchard*, 22 Idaho 517, 126 Pac. 1069; *Piekenbrock v. Smith* (Okl.), 143 Pac. 675, and other authorities from Kansas, Massachusetts, Alabama and Missouri.

The appellants contend that the trial court did not apply this test in the broad and liberal spirit now recognized by modern authorities, but that he was obdurate in the idea that the facts alleged by appellants in their answer were not sufficient to constitute duress, and that the case was controlled by *Ingebrigt v. Seattle Taxicab & Transfer Co.*, 78 Wash. 433, 139 Pac. 188. They complain that the learned trial

judge, in expressing his views in summing up the case, wherein, among other things he said, "I do not think that even if it was proven what defendant claims, any duress would exist in this case," shows that his mind was so imbued with that idea at the outset that the testimony tending to show duress was given scant heed by him. But the trial court showed that he had a very proper conception of the rules to be applied in the case, for in the commencement of his summing up he said: "The evidence in this case does not preponderate in favor of defendants. . . . The rule of law is that the contract or promissory note having been admitted, the presumption is that they are valid and a binding obligation; and to overcome that presumption and to invalidate the note on the ground of duress the evidence should be clear and satisfactory." That view of the trial court was clearly correct. Conceding that the liberal modern doctrine as to the true test of duress sufficient to avoid contracts otherwise valid is as stated by appellants, the rule as it now exists is that the question of duress is one of fact in the particular case, and it may exist whether the threat be sufficient or insufficient to overcome the mind of a man of ordinary courage.

Under the strict common law rule, an act could be avoided for duress *per minas* only when the threatened danger to avoid which it was done was either loss of life, loss of member, mayhem, or imprisonment. Some of the expressions used in the *Ingebrigt* case referred to would seem to indicate that the opinion writer was applying the same strict common law rule; but in any event the test is practically as stated by appellants, with the addition that it is one of fact in the particular case. It would not be proper to simply hold that, merely because a person who has made a contract declares under oath that he was intimidated and acting under fear and duress when the contract was made by him, the contract should by reason of his mere statement be avoided. If that rule were adopted most contracts would be avoided. In con-

sidering the matter of whether there was in fact restraint or
coercion, the courts usually consider the state of the mental
or physical health, the condition in life, the experience of
the person, and his education and intelligence.

Applying some of these tests to the appellant here, under
the facts, we find that they are both men in the prime of life;
that Anderson, who seems to have been the person principally
intimidated, was a man of more than ordinary experience,
at least of ordinary intelligence, who had been able to conduct
a banking business for a great many years, and who was
still mentally and physically competent to conduct a business
requiring large intelligence and considerable sagacity, de-
cision and ability. We further find that the negotiations
between appellants and respondents commenced on February
5, 1913, and that the contract which resulted on February 6,
1913, gave them thirty days in which to comply therewith,
during all of which time appellants had ample opportunity
to reflect upon their situation and upon the alleged threats
and accusations made against them; that appellants never
sought legal counsel; that when the negotiations were re-
sumed on April 12, 1913, they were conducted at intervals
for two days; that they separated several times during the
negotiations, and that during those times appellants did not
seek legal counsel or the counsel of any other disinter-
ested person. They proceeded very deliberately and did
much calculating.

There is a conflict in the testimony between appellants and
respondents as to just what threats were used. Appellants
insist that respondents threatened to prosecute them and
Scott and to throw the company into the hands of a receiver.
The respondents insist in their testimony that they never at
any time threatened to prosecute Moylan and Anderson, but
did express the opinion that Scott was guilty of embezzle-
ment or some such offense, did demand a change in the man-
agement, and did threaten to bring an action to put the com-
pany in the hands of a receiver. Anderson insists that the

threats that were made to him caused him to fear for his reputation, to fear the disgrace to his wife and children, and to fear for the safety of his bank, and of his affairs generally. It may be fairly questioned, in view of the long time given at the inception of the contract with respondents for reflection by appellants, whether they had any such fears at that time. So far as we can determine, respondents as witnesses were as credible as appellants.

There is considerable suggestion in the record that the affairs of the company in the hands of Scott in California were not properly handled, and there is a suggestion that the sale of the ten-acre tracts which were to be given by the original stockholders of the company to others was known to appellants long before it was known to any of the other stockholders. There is also justification for the belief that the sale of the Reid ranch, together with the other assets of the company, would give the appellants a profit equal to the difference between the amounts which respondents had paid in for their stock and the amounts which appellants agreed to give them for their shares. It is fairly inferable from the facts that the appellants had reason to consider at the time that they were receiving fair value for their notes as well as being rid of troublesome factors in the company.

Nor does the fact that appellants remained silent as to their coercion until a short time before the maturity of the notes justify a very strong inference that appellants had been coerced at the time of the making of the notes. Anderson himself wrote a letter to Scott in California, on April 12, two days before the execution of the notes, referring to the price agreed upon for the sale of the Cornwall, Polland, and Smith shares, in which he stated that Polland, Cornwall, and Smith "said that they will ask for a receiver for the company, and also that they will immediately take out papers against you and give them to Brockman to have you brought into this state to face a criminal charge." He makes no reference whatever in the letter to any threat being made to prose-

cute him (Anderson) or cause him or Moylan to face a criminal charge. Although he states in his evidence that at the time he wrote this letter Polland, Cornwall and Smith were present, the evidence shows he dictated the letter to his stenographer, and neither he nor his stenographer gave any testimony tending to show that the contents of this letter were coerced, although they do say that parts of it were suggested or dictated by Polland. If the affairs of the company were in confusion and the company was being mismanaged, it might be that it would have been perfectly appropriate to have had a receiver appointed for it. A threat of litigation by one who has a legal right to sue is not generally held to be duress within the meaning of the law. *Walla Walla Fire Ins. Co. v. Spencer*, 52 Wash. 369, 100 Pac. 741.

"It is not duress for one who in good faith believes he has been wronged to threaten the wrongdoer with a civil suit; and if the wrong includes a violation of the criminal law, it is not duress to threaten him with a criminal prosecution." *Ingebrigt v. Seattle Taxicab & Transfer Co.*, 78 Wash. 433, 139 Pac. 188.

"Ordinarily, when no proceedings have been commenced, threats of arrest, prosecution, or imprisonment do not constitute legal duress to avoid a contract; the threats must be made under such circumstances that they excite the fear of imminent and immediate imprisonment." *Sulzner v. Cappeau-Lemley & Miller Co.*, 234 Pa. 162, 83 Atl. 103, 39 L. R. A. (N. S.) 421.

In the instant case, none of the evidence, even taking appellants' testimony for it, tended in any way to show that there was any threat of imminent and immediate arrest and imprisonment. The threats at most were of prosecution at some indefinite time in the future. There was no restraint imminent at the time of signing the contract or signing the notes that could be considered as constraining the mind of an ordinary person.

There is an effort made by the appellants to classify the cases upon the question of what constitutes duress *per minas*.

There is no classification possible or necessary under the authorities. Each authority, so far as we have reviewed them, amounts almost to an authority for that case alone.

After considering all the testimony, we are convinced that the evidence does not preponderate against the findings of the court, and that the judgments should be affirmed.

MORRIS, C. J., PARKER, MOUNT, and CHADWICK, JJ., concur.