[No. 14216.   Department One.   November 23, 1917.]

## A. BERTSCHINGER, *Appellant*, v. R. H. CAMPBELL, *Respondent*.[1]

PAYMENT—RECOVERY OF MONEY—DURESS — PRESUMPTION — EXISTENCE OF CRIMINAL PROCEEDINGS. Where a physician paid money to avoid disgrace from a false charge of abortion, and under threat of imprisonment, the demand being in bad faith without the existence of right, there is no presumption of want of duress as in the case of making settlements and compromises; and the money may be recovered as money paid under duress, although no criminal proceedings had been commenced against him.

SAME—RECOVERY OF MONEY—EXTORTION—RIGHT TO. Rem. Code, § 2610, defining extortion as a crime against the person, creates a cause of action in favor of the person injured, although the statute is a general criminal statute.

SAME — RECOVERY OF MONEY — DEFENSES — COMPOUNDING FELONY. The compounding of a felony is not a defense to an action by a physician to recover money paid to avoid disgrace from a false charge of abortion and the false statement of the subject, supposed to be dying.

Appeal from a judgment of the superior court for Lewis county, Rice, J., entered October 17, 1916, upon granting a

[1]Reported in 168 Pac. 977.

nonsuit, dismissing an action to recover money obtained by extortion, after a trial before the court and a jury. Reversed.

*J. N. Hart, G. W. Wilson,* and *Wedmark & Grimm,* for appellant.

*Herman Allen* and *Hayden, Langhorne & Metzger,* for respondent.

Parker, J.—The plaintiff, Bertschinger, seeks recovery of the sum of $1,025, alleged to have been unlawfully extorted from him by the defendant Campbell, and also the sum of $125 as special damages incidental thereto. The cause proceeded to trial in the superior court for Lewis county, sitting with a jury, resulting in a judgment of dismissal rendered by the court upon the motion of the defendant's counsel at the close of the plaintiff's evidence. The motion and judgment were rested upon the ground that the evidence introduced in the plaintiff's behalf was not sufficient to support any recovery against the defendant, in that it conclusively showed that plaintiff voluntarily paid the money to the defendant. From this disposition of the cause, the plaintiff has appealed to this court.

Appellant is a physician, practicing his profession in Portland, Oregon. Respondent is a physician, practicing his profession at Little Falls, in this state, some seventy miles distant from Portland. On December 26, 1912, a young man and a young woman called at appellant's office in Portland and requested him to examine her with a view of determining certainly whether or not she was pregnant, they believing that she was then probably in that condition. Appellant was then given to understand that, should he find the young woman pregnant, they desired that he perform an abortion upon her. Appellant consented to examine the young woman, but positively refused to perform any abortion upon her. His examination convinced him that she was pregnant, and he so

advised them. He then charged her $5 for making the examination. No abortion was performed upon her by appellant and nothing further was ever done by him for her. Appellant was not acquainted with either the young man or the young woman, but from conversation then had with her, learned that she lived at Castle Rock and was soon going to Little Falls to work. Appellant was well known in Portland, having lived there thirty-three years, and had built up a good practice there in his profession. On January 6, 1913, eleven days after the visit of the young woman to his office, appellant received from respondent through the mail the following letter:

"Dear Dr;—A young lady lays dying from septic condition and incomplete abortion. She has made a full confession, you are charged with the crime. The confession is in my possession. In event of her death it will be turned over to the police. Confession is witnessed. I do not think she can last more than a day or so, judging by her present condition. I am very truly,          (Signed)   Dr. R. H. Campbell
    "January 4/12                               Little Falls, Wn."

While the letter, upon its face, does not state to whom it was addressed, it came to appellant through the mail, addressed upon the envelope to him in apparently the same handwriting as the letter, the postmark showing that it had been mailed at Little Falls. The figures "12" upon the letter indicating the year manifestly mean 13, since it was written after the visit of the young woman to appellant's office in Portland, which occurred, as we have seen, in December 26, 1912. Appellant was then wholly unacquainted with respondent. Remembering the visit of the young woman to his office a short time previous, and remembering that he had then learned that she was going to Little Falls to work, appellant concluded that the letter had reference to her. What appellant did and what occurred thereafter may be stated in appellant's own language from his testimony given upon the trial as follows:

"Q. When you received that letter you may state what you did? A. Well, I immediately called up my wife at that time and told her about the letter. . . . Q. Now, what effect did this letter have upon your mind? A. Why, the effect was somebody was putting up blackmail or a job, as I would call it. . . . Q. Now, after talking with your wife on the telephone, what did you do next? A. I waited for my wife to come to the office and we talked the matter over and she advised me to call up this Dr. Campbell on the telephone if possible. . . . A. I had to go to the long distance office. The lines were somewhat out of order on account of the storms at that time. Q. Just state what conversation you had with Dr. Campbell on the telephone. A. Why, I told Dr. Campbell this was Dr. Bertschinger; I told him I received the letter from him that morning, and told (asked) him what the meaning of the letter was. He told me the letter speaks for itself, and advised me to come over there. We could not carry a conversation on very distinctly as it was very hard to hear. . . . advised me to come over and told me what train to take. I wasn't posted on the trains and he told me to take the train leaving about 2 o'clock. I took that train over there and when I got there I met him just as he was going into his house, by the gate. I arrived in Little Falls about 5 o'clock, and we got to talking about the matter and I asked him what the meaning of the letter was. I wanted to find out what kind of a proposition I was up against, that was all; it looked like a piece of blackmail of some kind or shape to me. I had no reason to believe anything but that. I didn't know if any girl was in league with Dr. Campbell in the proposition, or whether something else had been done or what. . . . I asked about the girl and I wanted to see her. He said, There is not much for you to see here, she was lying unconscious and liable to draw her last breath and no chance to see her. Finally he told me he had her in his house and laughed at me and said he had me just where he wanted me. He threatened to have me arrested, turn me over to the authorities. Q. What did he say in reference to the official capacity of himself? A. Well, that came later on. I then challenged him to take it up with the authorities or I would take it up myself, and then he told me it was no use to make any fuss over it, as he was the health officer there and the best thing I could do was to settle with him, and in the event of

death he could sign the death certificate, he was health officer there and the only physician in the town. . . . Q. What else did he say? . . . A. When I spoke of taking it up with the authorities myself he then told me I had better not do that, I better settle the proposition with him, and first he asked me to pay the price of the nurse, which was $25. That I paid him in cash at the time. Then after that, I guess he thought I was a good subject, and he again said for a thousand dollars he would protect me no matter what the outcome would be. Under the circumstances I reasoned if he had such a confession, although it was a frame-up; that if the girl did it, which I didn't know whether she did or not, I would be liable if she did, he might use it against me—rather than have a case of that kind I would sacrifice a thousand dollars and then investigate and find out and fight him afterwards. . . . I told him I could not pay any thousand dollars; I had just come back from the east on a trip and I told him I could not raise a thousand dollars. You will have it here in two hours he said. I told him I could not raise that in 24 hours; I could raise $500 and give him my note for the balance. He said no, no notes and no drafts, a thousand dollars in cash, in gold. That was the only option I had. We walked down to the depot. I waited four or five hours. The train wasn't on schedule, and got home along about two o'clock in the morning. I told my wife of the conversation I had with Dr. Campbell and she advised me to raise the money by mortgage or some way and go over there and protect my name rather than face this thing; it was a blackmail proposition, but rather than take a chance of having that on me, I had better pay a thousand dollars. So I thought of Mr. McKensie, a friend of mine, and through him we raised a thousand dollars and took it over to him. . . . Q. When you left Dr. Campbell did he give you any length of time in which to raise the thousand dollars? A. Twenty-four hours specifically. . . . He said to have it there in 24 hours. Q. When did you get back to Little Falls? A. We took the train at home that day at 2 o'clock and arrived there about 5. Q. Who went with you? A. My wife. Q. Your wife at that time? A. Yes. . . .

"Q. Now when you got back to Little Falls you say that it was about 5 o'clock. Just tell the jury what happened then. A. My wife and I approached his house and he came

out as we got to the gate, in his shirtsleeves; he didn't have a coat on and he evidently was expecting us and before we got to the porch of the house he came and opened the door to receive us and as we entered the house he told my wife to go into the room to the left and took me straight over to where he had his office in the residence and we had a short talk there and he said the girl was about the same and she was still unconscious and that he didn't know whether she would draw her last breath any minute, and he wanted to know if I had the money. I said, yes, I had it there. By the way I forgot to mention this: The day before he said he would surrender this confession from the girl if I paid over this thousand dollars. This he refused to do the second day. He didn't give us the confession, but he kept the money. That is, after a little talk I said my wife had the money. He wanted me to get the money. I told him my wife had it, that we had to mortgage our home and that my wife had the money. A. When I told him my wife had the money—really the money was coming out of her money as well as mine—he sort of hesitated and said, Well, we will have her come in, and she came into the room and asked him what the money was paid for, and he said, To keep that man out of the pen, and there was some more conversation which wasn't material, but she counted out the money to him, my wife gave him that money in 20-dollar gold pieces. . . . after he had the money he patted us on the back and said the danger was all over, the girl wasn't in a very serious condition at all, he thought everything would come out right and in the event of her death he would protect us. We then left Dr. Campbell's place and went home. Q. State whether or not you paid the money by reason of the fact that you were afraid of being prosecuted? A. Yes, the only reason I did pay it."

The jury would have been full warranted in believing all of the facts above stated had the cause been submitted to it.

The principal contention of counsel for respondent, and apparently the conclusion reached by the trial court, is rested upon the theory that it must be determined, as a matter of law, from these facts that appellant cannot recover because the money was not paid under such legal duress as the law requires to be proven to avoid a contract, in that appellant

was not charged with the commission of a crime in any proceeding instituted in court, nor was he threatened with immediate arrest or imprisonment. In other words, counsel invoke the rules applicable to cases where claims of right are asserted in good faith accompanied by threats of civil or criminal proceedings made in good faith looking to the enforcement of such asserted rights, and where the contract, settlement or compromise involved would not be invalid for want of consideration, apart from the question of coercion. Counsel rely principally upon the law as announced in our decision in *Ingebrigt v. Seattle Taxicab & Transfer Co.*, 78 Wash. 433, 139 Pac. 188. In that case the plaintiff sought to set aside a settlement, claimed to have been made by him with the defendant under duress, for money alleged to have been unlawfully appropriated by him, and to recover damages measured by the value of the consideration he gave to effect the settlement. Judgment of nonsuit was rendered at the close of the plaintiff's evidence upon motion of the defendant, the case being taken from the jury, which judgment was affirmed by this court. No criminal prosecution was commenced, it was only threatened. Judge Gose, speaking for the court, at page 436 of the reported decision, said:

"Under the appellant's testimony, he had unlawfully appropriated money which belonged to the respondent. The respondent had a right to say to him that, if he did not settle, it would commence a civil action. It also had a right to point out to him that he was subject to a criminal prosecution. Under his own testimony, the good faith of the charge that he was subject to criminal prosecution cannot be questioned. It is not duress for one who in good faith believes that he has been wronged to threaten the wrongdoer with a civil suit; and if the wrong includes a violation of the criminal law, it is not duress to threaten him with a criminal prosecution."

The learned writer of the opinion cites, as lending support to the conclusion reached therein, the following decisions: *Hilborn v. Bucknam*, 78 Me. 482, 7 Atl. 272, 57 Am. Rep.

816; *Bodine v. Morgan,* 37 N. J. Eq. 426; *Thorn v. Pink-ham,* 84 Me. 101, 24 Atl. 718, 30 Am. St. 335; *Buchanan v. Sahlein,* 9 Mo. App. 552; *Sulzer v. Cappeau-Lemley & Miller Co.,* 234 Pa. St. 162, 83 Atl. 103, 39 L. R. A. (N. S.) 421; *Loan & Protective Assn. etc. v. Holland,* 63 Ill. App. 58; *Elston v. Chicago,* 40 Ill. 514, 89 Am. Dec. 361; *Beath v. Chapoton,* 115 Mich. 506, 73 N. W. 806, 69 Am. St. 589; *Williams v. Stewart,* 115 Ga. 864, 42 S. E. 256; *McCormick Harvesting Machine Co. v. Miller,* 54 Neb. 644, 74 N. W. 1061; *Alexander v. Pierce,* 10 N. H. 494; *Englert v. Dale,* 25 N. D. 587, 142 N. W. 169; *Harrison Township v. Addison,* 176 Ind. 389, 96 N. E. 146.

It may be said, speaking generally, that all these cited decisions deal with contracts, settlements or compromises which within themselves, apart from the question of duress, were not invalid for want of lawful consideration, and also that, in making the demands and threats which brought about the contract, settlement or compromise, the party charged with duress believed in good faith that he was making a lawful demand and threat looking to the enforcement of a right possessed either by himself or those for whom he was acting. We notice here, however, those of these decisions which may seem to deal with situations not wholly of this nature.

In *Sulzer v. Cappeau-Lemley & Miller Co., supra,* the demand involved was made for property which the one making the demand believed in good faith that his company was entitled to, but the alleged threat was that the son of the one upon whom the demand was made would be imprisoned if the demand was not complied with. Settlement was thereupon effected, a valuable consideration passing from each party to the other. No proceedings having been commenced nor warrant of arrest issued, and no actual arrest of the son attempted, the evidence was held, as a matter of law, not sufficient to support a verdict of recovery of the fruits of the settlement upon the ground of duress. That case differs from the others in that the threat was not made directly against

the one upon whom the demand was made. The contract, however, was not invalid for want of valuable considerations passing from each of the parties to the other and rested upon a demand made in good faith.

In *Englert v. Dale, supra,* we have a somewhat similar situation, in that the alleged threat was to have the son of the one upon whom the demand was made imprisoned if the demand was not complied with. The demand was, however, made in the assertion of a right which the one making it believed in good faith that he was entitled to. That case was tried and decided by the court without a jury, and it was found, as a question of fact, that the mortgage in question, claimed to have been procured by duress, was voluntarily executed.

The decisions in *Harrison Township v. Addison* and *McCormick Harvesting Machine Co. v. Miller, supra,* were rested upon the ground that there was no duress in law justifying the avoiding of the contracts, which were settlements of claims made in good faith for misappropriation of moneys. Another reason pointed out by the courts in both of these cases why the plaintiffs could not recover was that the contracts of settlement were unenforcible as being against public policy, in that they were, in effect, contracts to obstruct the administration of the criminal laws. Nothing said by the courts in those decisions, however, suggests that a contract unenforcible as against public policy might not also be void because of its being made under duress. If made under duress such as to render it void, the question of its being unenforcible because against public policy would not be of any consequence in so far as the recovery upon a right growing out of the transaction is concerned.

The decisions above noticed and relied upon by counsel for respondent deal with situations quite different from that here involved. In each of them, as already noticed, the one making the demand and accused of coercion was seeking to enforce rights which he in good faith believed he possessed, either for himself or for those for whom he was acting. The

contracts and settlements so effected were not unlawful in themselves so far. as the settlement of the private rights in question were concerned, nor were they invalid for want of consideration. Here we have a case where the respondent had no shadow of right to rest his demand upon. Not only did no right exist in him to make such demand, but no right existed in any one to make such demand. He could not have made the demand in good faith if the evidence introduced in appellant's behalf is true, and we must so regard it for present purposes. .There is something else in this case beside the question of duress as such question is presented and determined in cases like *Ingebrigt v. Seattle Taxicab & Transfer Co., supra,* and those therein cited and here relied upon by counsel for respondent. The presumption of want of duress in the making of contracts, settlements or compromises, under the circumstances shown in those decisions, does not apply to the payment of money under the circumstances here shown. Where contracts, settlements or compromises are made between parties where there is a fair show of legal right, and where the contract, settlement or compromise is not manifestly unfair and is made in response to a demand made in good faith, it, of course, should require the most convincing proof of duress in order to warrant its avoidance on that ground; while the very fact that one yields to a demand made upon him without the shadow of right, and one which, under no circumstances, could be made in good faith, suggests of itself some degree of duress inducing the yielding to such demand.

Counsel for respondent cite, and in some measure rely upon, our decisions in *Thorne v. Farrar,* 57 Wash. 441, 107 Pac. 347, 135 Am. St. 995, 27 L. R. A. (N. S.) 385, and *Cornwall v. Anderson,* 85 Wash. 369, 148 Pac. 1. Both of these cases were tried by the court without a jury, and the questions of duress were therein disposed of as questions of fact and not as questions of law. In the *Thorne* case, *supra,* Judge Gose, speaking for the court, at page 444, said:

"We are persuaded that the promptings of conscience and not threats moved him to marry the respondent and make the reparation that honorable conduct demanded."

In the *Cornwall* case, *supra*, this court refused to disturb the findings of the trial court that appellant had executed the notes in question freely and voluntarily. In each of those cases there was a yielding to a demand made in good faith.

In much of the argument advanced by counsel for respondent they seemed to forget that this cause was being tried in the superior court before a jury whose province it was to decide the questions of fact involved. Now, keeping in mind the facts as shown by the evidence introduced in appellant's behalf, which we must, for present purposes, regard as true, let us notice some of the decisions dealing with demands which, in whole or in part, were without right and known to be such by those making the demand. We think it will appear therefrom that the courts do not require such convincing proof of overcoming the free will of the person upon whom the demand is made as where it is made in good faith with some show of legal right and a recognition of that right by the person who yields thereto. In other words, there is running through all the decisions relied upon by counsel for respondent in this case the element of presumption that, when one yields to a demand made upon him in good faith, accompanied by a fair show of legal right in the one making the demand, he does not yield because of duress in the legal sense. The case is manifestly quite different where one yields to demands made upon him without any show of legal right or good faith upon the part of the one making the demand. Indeed, the contrary presumption as to duress in such cases would seem more in agreement with common experience and common sense, since it would seem that one would not ordinarily yield to such a demand except he be influenced by some present overpowering necessity viewed from his standpoint.

In *Pemberton v. Williams*, 87 Ill. 15, the evidence tended to show that the plaintiff was compelled to pay more than was

plainly due upon the purchase price of a land contract to procure a deed, and that he was induced to do so in order to complete an advantageous resale of the land by him to another, this being known to the one who made the demand upon him for the excess amount. · The duress involved manifestly consisted only of the necessity of his procuring a deed to the land in order that he might make the resale. The court directed the jury to find against him, in an action brought by him to recover the excess so paid by him. In holding this to be error Justice Breese, speaking for the supreme court, said:

"It is very clear, we think, the court, in so interposing, invaded the rightful province of the jury. There was testimony before the jury tending to show that there were only fifty dollars due on the land, and when the appellee demanded three hundred and sixty-five dollars as his due before he would deliver a deed, it was a fair question for the jury, whether, under the circumstances by which appellant was surrounded, by the sale of the land to Slinglove, which falling through a good sale might be lost, the payment was not involuntary—made under a sort of moral duress. The jury should have been left free to pass on that point."

*Beath v. Chapoton,* 115 Mich. 506, 73 N. W. 806, 69 Am. St. 589, was an action to recover upon notes executed in settlement of a charge of embezzlement. The evidence seemed to show that the notes were given under a threat of criminal proceedings for an amount greater than the sum embezzled. While the court held that, in so far as the giving of the notes in settlement to the extent of the amount actually embezzled was concerned, it was, as a matter of law, not duress, it was held to be for the jury to decide to what extent the notes were given without consideration, and to render a verdict accordingly. In so deciding, Chief Justice Grant, speaking for the court, at page 510, said:

"There is no evidence of any threats or restraint at that time, no prosecution had been commenced, nor was there any statement that any had been commenced, and he was free to go and come as he chose. It therefore appears that Chapoton,

after the alleged charge and threats were made, took ample time to consider it, and then voluntarily settled by giving these notes. This is not the course pursued by a man conscious of his innocence, and in the possession of his faculties. There is nothing to show that he was young or old, inexperienced, feeble in body or mind, or unable to indignantly deny and resist a false charge of embezzlement and felony. Under this record the only question to be submitted to the jury with regard to him was whether there was a failure, in whole or in part, for the notes. Under the above decisions, he was liable upon them to the extent of moneys appropriated by him, if any were so appropriated; and it was the province of the jury to determine the amount. If he had appropriated none of the plaintiff's money, of course the notes were without consideration, and void."

In that case there was no commencement of any criminal proceedings nor any threat of immediate arrest. That case seems to hold that, in so far as the consideration failed, there could be no recovery upon the notes, regardless of the question of duress.

*March v. Bricklayers' & Plasterers' Union*, 79 Conn. 7, 63 Atl. 291, 118 Am. St. 127, 4 L. R. A. (N. S.) 1198, was an action brought by the plaintiff against the union to recover $100 extorted from him under a threat of withdrawing his employees and thereby injuring his business. Here we have a case like the one before us, wherein the money was exacted without any legal right whatever, and without any possibility of its having been demanded in good faith. In awarding recovery of the money so exacted, Justice Prentiss, speaking for the court, said:

"The most elemental principles of justice and right, which have by universal consent been adopted into the common law, suffice for a conclusion that money cannot be lawfully exacted of a man in the manner here successful."

*Joannin v. Ogilvie*, 49 Minn. 564, 52 N. W. 217, 32 Am. St. 581, 16 L. R. A. 376, was an action to recover money paid by the plaintiff to free his real property from a lien claim filed against it without any right whatever. It was there held

that this was not such a voluntary payment on his part as to prevent his recovery of the money from the lien claimant who had thus induced its payment.

*Chicago v. Northwestern Mut. Life Ins. Co.*, 218 Ill. 40, 75 N. E. 803, 1 L. R. A. (N. S.) 770, was an action by the insurance company to recover from the city payments made by it to the city upon demand for water rent due by previous owners or occupants of the building and for which the insurance company was in no way liable, induced by threats of the city authorities that the water would be shut off until this demand was satisfied. This was held not to be a voluntary payment on the part of the insurance company, but that it was one made under duress such as enabled it to recover the money so paid.

*Goddard v. Bulow*, 1 Nott & McCord (S. C.) 45, 9 Am. Dec. 663, was an action to recover excessive freight charges demanded as a condition that the freight be received and transported, the one upon whom the demand was made being then under great necessity of having the goods transported. This was held an exaction without legal right to the extent of giving the plaintiff a right of action for the recovery of the excess so paid, upon the theory that it was not voluntarily paid.

These are but a few of the many decisions which could be cited showing that the presumption against duress which the courts indulge in touching contracts and settlements induced by demands made in good faith are not applicable to the facts appearing in this record.

Our criminal statutes relating to extortion and providing punishment therefor, we think, also lend support to appellant's contention. Section 2610, Rem. Code, so far as applicable here, reads:

"Every person, who, under circumstances not amounting to robbery, shall extort or gain any money, property or advantage . . . by means of force or any threat, either to accuse any person of a crime; or . . . to expose or im-

pute to any person . . . disgrace . . . shall be guilty of extortion and shall be punished by imprisonment in the state penitentiary for not more than five years." Rem. Code, § 2610.

That respondent's words, written and spoken, and his attitude towards appellant plainly evidence an accusation of crime made against appellant and a threat to cause him to be criminally prosecuted, and also a threat to expose him to disgrace, respondent having the apparent means at hand to so render appellant serious injury, though he be innocent, if he did not pay the money demanded, seems too plain for argument. It is true that this is a general criminal statute and, of course, was enacted for the benefit of the public; but since the extortion here defined is a crime against the person and works to his personal injury as well as that of the public, the commission of it would create a cause of action in favor of the person so injured. The right to recover money so extorted was learnedly reviewed by Justice Ailshie, speaking for the supreme court of Idaho, in *Wilbur v. Blanchard*, 22 Idaho 517, 126 Pac. 1069. The plaintiff in that case, under a threat of criminal prosecution, paid $2,150 in settlement of an embezzlement charge made against him, he having embezzled only $150. The criminal extortion statute of Idaho is in substance the same as ours. The trial court instructed the jury, as stated in the opinion, in substance as follows:

"That the defendant cannot defend this action upon the mere ground that the charge of theft which he made against plaintiff was true, or, in other words, the truth or falsity of that charge alone is wholly immaterial to this inquiry, as one is not justified in extorting money from even one guilty of crime, provided you find any extortion was practiced."

The jury returned a verdict for $2,000, evidently finding that only $150 was appropriated by the plaintiff. In affirming this verdict and judgment and noticing numerous authorities touching the question of duress, the learned justice, among other things, said:

"Now, reverting again to the provisions of our statute, we find that the fear 'such as will constitute extortion may be induced by threat' and that such threat may be simply 'to accuse' the party of a crime. It is apparent that money or property might as readily be obtained by one who is in fact guilty of the crime by threatening to accuse him thereof, as from one not guilty of a crime who is *threatened* with such accusation. It seems to us that justice demands that no one should be allowed to extort money from another which is not justly due or owing to him by overpowering the will and mental faculties of his adversary under threats of arrest or imprisonment, even though the party may in fact be guilty of such crime. Two wrongs do not make a right, and the fact that a man is guilty of larceny does not justify the man from whom the property has been stolen to use that fact as a means or instrument of obtaining money or property from the thief which is not justly due and owing."

Manifestly the judgment was affirmed upon the theory that the jury could well find that there was no duress in plaintiff's yielding to the demand to the extent of his paying the $150 actually due from him; indeed, it might have been so held as a matter of law, yet the jury could also well find that the additional $2,000 was paid under duress. Manifestly the court considered the question of duress, as to the $2,000 so paid, as one of fact for the jury to decide.

It was suggested in oral argument, though not advanced in the briefs as a defense, that the payment of this money, under the circumstances as shown by appellant's evidence, was, in effect, the compounding of a felony, and, for that reason, the judgment of dismissal was not erroneous. This, upon the theory that the agreement was so tainted with wrong and illegality that the courts will not lend their aid to the enforcement of the right claimed by appellant. It hardly seems likely that respondent would, upon a new trial, care to invoke this defense, since it would imply that he was himself equally guilty of compounding the crime with which he charged appellant. That would seem to be an admission on his part that the money was received, as well as paid, for that

purpose. But even that theory would still leave open the question of appellant having paid the money under duress. Plainly a contract or settlement amounting to the compounding of a crime could be void because of duress as well as unenforcible because of being against public policy. If void because of duress, it was not a binding contract or settlement under which appellant could retain the fruits thereof, even though it was also a contract which, but for the duress, would have been against public policy and as such could not be the foundation of any right to be asserted in the courts. The trial judge did not take the case from the jury upon this ground, but solely because he decided, as a question of law, there was not such duress as entitled appellant to recover the money paid. This is rendered plain by remarks of the judge made in announcing his decision and preserved in this record. Clearly it would have been erroneous for the trial court to have dismissed the action upon the ground that the payment of the money was for the compounding of a felony, in view of the evidence produced in appellant's behalf. This question will not likely arise upon a new trial for the reason above indicated, and besides respondent has pleaded that the money was paid to him for a lawful purpose. The question is here noticed only in the light of the present status of the case to show that this suggested theory does not support the judgment of dismissal.

The judgment is reversed, and the cause remanded to the superior court for a new trial.

ELLIS, C. J., FULLERTON, MAIN, and WEBSTER, JJ., concur.