No. 28,027.

THE WESTERN PAVING COMPANY, *Appellee,* v. E. I. SIFERS et al., *Appellants.*

(268 Pac. 803.)

Opinion filed July 7, 1928.

*C. H. Brooks, Willard Brooks* and *Howard T. Fleeson,* all of Wichita, for the appellants.

*Thomas E. Elcock, James G. Martin, Dale M. Bryant,* all of Wichita, and *G. A. Paul,* of Oklahoma City, Okla., for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a promissory note. The defense was that the note was given under duress. The court directed a verdict for plaintiff. Defendants appeal.

In February, 1923, defendant E. I. Sifers committed a gross fraud upon P. J. Kealy, whereby Sifers received the equivalent to him of $6,365. When confronted with the fraud and asked to make reparation, he replied with the flippant falsehood that he had made a fair bargain. Kealy said that if Sifers did not respond with cash, Kealy would see the county attorney and would cause Sifers some trouble. Sifers refused to pay. Kealy complained to the county attorney of Jackson county, Missouri, and on May 12, 1923, the grand jury returned an indictment charging Sifers with fraudulently and feloniously obtaining from Kealy a certain warrant for the sum of $6,365. Sifers was not brought to trial, and in February, 1925, he made a settlement with Kealy. The terms of settlement were worked out by attorneys for the parties. A written memorandum of settlement was prepared, and, pursuant to it, Sifers gave his note for $3,289.23, payable one year after date, with interest at six per cent per annum. Sifers' wife signed the note. The criminal action was dismissed. In February, 1926, Sifers paid interest on the note and arranged for its renewal. In March, 1927, he forwarded a check to pay interest on the note pursuant to an understanding regarding its renewal, but having consulted an attorney he discovered he had a defense to the note, and he permitted the check to be protested.

Sifers employed an attorney when he was indicted. The attorney was a good lawyer and advised him respecting his rights. In his own mind Sifers was not guilty and owed Kealy nothing, and his attorney advised him he could not be convicted; but he distrusted the Jackson county, Missouri, court. Kealy was an influential man, and they did not always do things just right down there. So in terror that he might "go over the road" under the musty indictment, he went to the office of his attorney, and with nobody present but himself, his wife and his lawyer, but with a will paralyzed by fear, he signed the note. The pang caused by the indictment did not subside until he signed the note. During the two years prosecution lagged; he hardly knew what he was doing. After the indictment was dismissed, his mind was still affected. He was in continual fear of consequences of something for another two-year period, and until he consulted his last lawyer. Whatever he did about the note was not of his free will.

At the time of the trial Sifers was thirty-four years old. He had been in business for fifteen years. He was in the road-building business when he committed the fraud. He operated three companies

and did business on a large scale. At the time of the trial he was manager of the Wichita branch of the Sifers Candy Company, which did approximately $100,000 worth of business a year. He was married on October 7, 1922, and he asked no special consideration on the ground he was feeble-minded.

Sifers did some road work in Osceola, Ark., and claimed the sum of $11,000 was due him. Kealy sold rock asphalt to Jackson county, Missouri, and was paid with a warrant for $6,365, payable out of road funds to be collected the next year. Sifers owed the Magnolia Petroleum Company for road-building material, and the Petroleum company was pressing for payment. Kealy turned over his warrant to Sifers at a discount of ten per cent, and Sifers turned it over to the petroleum company at par. Sifers agreed to pay Kealy for the warrant the sum of $5,789.70 in cash out of the funds then due him from Osceola. Kealy testified as follows:

"For the warrant, he agreed to give me cash, which he stated was immediately due him from Osceola, Ark. The representative of the Magnolia Petroleum Company was in his office insisting that something be done that day. Sifers told me that the council had something to do with the paying of this money at Osceola, and it had been a matter over which there was some controversy; that the controversy had been settled and he was about to receive his money in two or three days. For me to make certain of that fact, he suggested for me to call, as I understood him to say, the city attorney of Osceola. So I called the attorney on the long distance phone, and he told me this was due Sifers and would be paid in a few days. I pressed him as to just when, and he stated that he couldn't state definitely, but certainly not later than Wednesday or Thursday of next week. Thereupon I gave Sifers the warrant, and he gave me a statement in which he agreed to pay this sum of cash. . . .

"The following week I didn't receive the cash. I again called on Mr. Cochran, who I thought was the city attorney, and he said there had been a slight hitch and it would be a day or two more, and days dragged into weeks, and weeks into years, and to this day I have never had a settlement out of Osceola. Later on, I would judge in April, I went to Osceola and then for the first time found that Cochran is not the city attorney but Mr. Sifers' attorney, and this money was not due. It was not payable. . . . I told Sifers that he had misrepresented the situation to me in several particulars: First, there were assignments and attachments against the account; second, it was not cash that was coming to him, but this was a bill payable after five years; and third, that Cochran was his attorney and not city attorney, and that I wanted the matter straightened out; that I had sold him the warrant for cash and he had used it for cash, and I was looking to him to settle the affair. . . .

"I instituted civil proceedings in Missouri against Sifers to collect in Mis-

souri and Tennessee and Arkansas and laid a complaint before the prosecutor of Jackson county."

The written statement which Sifers signed and gave to Kealy ·reads as follows:

"In consideration of the purchase of warrant No. 3066, dated December 12, 1922, in the principal amount of $6,365 on the bridge and road fund of Jackson county, Missouri, receipt of which is hereby acknowledged, I agree to pay the sum of $5,789.70 in cash for said warrant out of the amount now due and payable to E. I. Sifers, operating as the Arkansas Good Roads Company, from the city of Osceola, Arkansas, for work performed, and which amount now due is considerably in excess of the sum herein agreed to be paid.

"It is also hereby affirmed that there are no liens or attachments against this amount, and the said sum is free of all incumbrances; and this is an order on Judge J. T. Coston or the Osceola Street Maintenance District No. 1, of Osceola, Arkansas, for the sum of $5,789.70, or on the drawer of this order out of the amount now due and payable for work performed."

Existence of this writing precluded Sifers from disputing his fraudulent representations, had he been disposed to do so, and he did not deny, qualify, or mitigate by explanation, any statement of fact embraced in Kealy's narrative. Kealy's detailed account of what occurred affected Sifers' personal integrity, his integrity and standing as a business man, and bore directly upon an important feature of the lawsuit. In view of the nature of the imputation and the circumstances under which it was made, the court is not disposed to quibble about it, and the inference will be indulged that culpability sealed Sifers' lips.

Sifers' account of the conversation with Kealy when Kealy returned empty-handed from Osceola follows:

"Mr. Kealy came to my office and stated that he was unable to collect on the order I had given him on the city of Osceola, and stated that if I wasn't willing to give him cash in exchange for this order I had given him that he would see the prosecuting attorney and cause me some trouble, and I told him that we had made a fair trade and that I would not do that. I refused to pay him the cash he demanded and told him there was more than sufficient due from the work we had completed to take care of the order. As I recollect there was approximately $11,000 due. I further told him that I would assist him in any way possible, but he didn't want that."

The law defines duress. Whether, in a given instance, duress has been exercised is a question of fact. To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage

with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment. The evidence to establish duress must be substantial—not merely some evidence—and the court is not obliged to submit to the jury evidence which does not measure up to the required standard of proof.

"It would not be proper to simply hold that, merely because a person who has made a contract declares under oath that he was intimidated and acting under fear and duress when the contract was made by him, the contract should by reason of his mere statement be avoided. If that rule were adopted most contracts would be avoided." (*Cornwell v. Anderson*, 85 Wash. 369, 375.)

"The appellant's testimony shows that he was knowingly guilty of moral turpitude; that the respondent claimed that he had appropriated $1,500 of its money; that it offered to settle on the basis finally agreed upon; that its officers pointed out to him that he was subject to arrest and imprisonment; that after a full discussion and after he had twice left the office and voluntarily returned, he made the settlement. It seems conclusive that, under the admitted facts, it would be trifling with the law to submit the case to a jury." (*Ingebrigt v. Seattle Taxicab & Transfer Co.*, 78 Wash. 433, 437.)

The criminal law may not be used as a remedy for the collection of debt—threat of prosecution for selling liquor to coerce payment of damages for personal injury (*Thompson v. Niggley*, 53 Kan. 664, 35 Pac. 290). A proposition to a debtor that he may buy off a criminal prosecution is illegal—a mortgagee proposes not to prosecute the mortgagor for selling mortgaged property if the mortgagor will pay the note. Threat of criminal prosecution may not be used to secure an unconscionable advantage—as in the typical case of an aged mother giving a mortgage on her humble home to save her wayward son from the penitentiary. These propositions are not disputed, and all the authorities agree that a note given, for example, to an employer by an employee for money embezzled by the employee may not be avoided on the ground of duress because of fear of imprisonment for the crime. There is disagreement respecting the effect of suggestion of lawful criminal prosecution in connection with effort to secure a settlement. According to one view, if the employer uses the suggestion to subdue the will of the other and forces him to make a settlement which he would not make voluntarily, the employer perverts the criminal law, made for the protection of the public, to private use; and if the suggestion, which in its nature is adequate for the purpose, does overcome the will of

the employee, he is not bound by the settlement. (*Morse v. Woodworth*, 155 Mass. 233.) The other view is less sublimate and takes into account the natural reactions of ordinary men to the realities of life. The employer has a privilege to initiate prosecution which will result in conviction and imprisonment. This privilege is sometimes called a duty. It is not a legal duty. He is under no liability to anyone if he chooses to pocket his loss and remain silent. The so-called duty of a good citizen to take an interest in law enforcement does not make prosecution imperative. The social welfare may often be better served by refraining from prosecution. So the employer has a privilege to prosecute. He also has an unqualified right to restitution by the embezzler of the embezzled funds. He does not forfeit that right by announcing disposition to exercise his legal privilege, and he may say, "If you do not make reparation I will prosecute you criminally." If because of the announcement, the embezzler does settle, the constraint lies in fact in the consequences of his own criminal act; and so long as the threat to prosecute is not coupled with agreement to stifle prosecution if the employee does pay, the threat is not tainted with illegality.

The adherents to each view regard their own as supported by the better reasoning and the weight of authority. This court is committed to the doctrine that in negotiations for settlement of the claim of a person injured by the wrongful conduct of another, it is not duress for the injured person to threaten to use the law to its full extent against the other. (*Riney v. Doll*, 116 Kan. 26, 225 Pac. 1059, and cases cited on page 32 of the opinion.) Logically, it would follow that if the wrongful conduct should include violation of the criminal law, it would not constitute duress to threaten the wrongdoer with criminal prosecution; but the court has not so declared, and it is not necessary to determine the matter now.

Kealy's statement that if Sifers was not willing to give cash for the dishonored order which had been given Kealy as the equivalent of cash, Kealy would see the prosecuting attorney and would cause Sifers some trouble, did not approach duress by threats or use of the processes of criminal law for a private purpose.

Kealy's statement did not impress Sifers, and Sifers did not pay. Kealy went to the county attorney, the indictment was returned, Sifers was arrested, and the prosecution remained pending for about two years. Sifers testified as follows:

"During the time that the indictment was carried along, my attorney told me that Kealy and his attorney said they were going to attempt to put me 'over the road.'"

That is the only statement attributed to Kealy, other than the one which has been considered, which Sifers averred induced execution of the note. It will be observed the contemplated attempt was not conditioned on Sifers' failure to settle and had no connection with or relation to Sifers' civil liability. Sifers had denied liability, had refused to settle, and that was the end of that. When and to whom the statement was made are not disclosed. When the attorney told Sifers about it is not disclosed. Kealy testified he did nothing after the indictment was returned, and there was no evidence he did anything to press or speed the prosecution after the indictment was returned. There was no evidence the county attorney or anyone else ever made any preparation to try the case, or that the indictment was on any calendar that would ever cause it to be called for trial.

No duress existed before the indictment was found. On the face of this record, the indictment was lawfully procured for a lawful purpose without trace of color of duress, and any perturbation it may have caused Sifers did not result from any wrongful invasion of his interest by Kealy. The indictment was suffered to grow stale. As a generator of fear it had lost all power to rouse genuine apprehension of peril, imminent or prospective, before the settlement was made. It could not operate unless somebody energized it, and neither Kealy nor anybody else was taking any interest in it. Sifers, testifying in his own behalf, said, "They evidently did not want to try it." The result is, the facts disclosed were not sufficient in law to furnish a foundation on which to base a charge of duress.

"The one really substantial question in the case is whether the court was justified in directing a verdict for the plaintiff. The action was upon an account stated. The defense was duress. . . . When it is perfectly evident from the testimony adduced that there is no foundation for a claim of duress, the court may so decide and take the case from the jury. . . . . The parties were several days in looking over their accounts. Mutual claims and allowances were made. The defendant testified that plaintiff's agent told him that he had committed grand larceny, and that he was liable to imprisonment in the state of New York; that he wanted him to get down to a settlement and make it good, or he would have him sent to state's prison in New York for grand larceny; that he (defendant) became nervous, 'and was sweating like the deuce,' and then signed the document. The defendant was apparently a man of intelligence and business experience, thirty-six years of age. He had

dealt with plaintiff nine or ten years—had sold their machinery and engines in different parts of the country. To claim that he was imposed upon and put in such fear as to be unable to understand what he was doing looks a great deal like self-stultification. The surrounding circumstances completely negative his claim of duress. Without spending further time in the discussion of the facts, we are satisfied that, upon the defendant's own showing, the court was amply justified in the ruling made." (*Rochester Machine Tool Works v. Weiss,* 108 Wis. 545, 547, 548.)

The answer pleaded want of consideration for the note, and at the trial Sifers testified as follows:

"There was no reason for my signing this note outside of the fear of this criminal prosecution, and I would not have signed it if it had not been for the criminal prosecution. There was no other consideration for the note given. . . . I got nothing for the note except my indictment was dismissed."

Sifers was mistaken. The consideration for the note was expressed in the memorandum of settlement which, after reciting the purchase of Kealy's road warrant, to be paid for in cash out of the amount which Sifers claimed was due from the city of Osceola, continued as follows:

"And whereas, it developed after said purchase that none of said money could then be collected out of said source, and . . .

"Whereas, it is now thought that there will eventually be available out of said fund at Osceola, Arkansas, for payment to said Kealy, the sum of $2,-232.25; and

"Whereas, to make up the difference between said last named sum and said purchase price of $5,789.70, said Sifers has this day delivered a promissory note in the sum of $3,389.23, signed by himself and Elizabeth Sifers, his wife. "Now, therefore, it is agreed: . . ."

Other subjects discussed in the brief are not important. The judgment of the district court is affirmed.

HOPKINS, J., concurs in the result.