Argued September 21, affirmed October 11, 1927.

## PORT OF NEHALEM v. ROBERT NICHOLSON.

(259 Pac. 900.)

**Trial—Parties Moving for Directed Verdicts Stipulate for Submission for All Fact Questions to Court and Waive Jury Trial.**

1. When each party moves for directed verdict, they stipulate, in effect, that all questions of fact shall be submitted to court for its decision and waive jury trial.

**Appeal and Error—Court's Fact Findings, After Motions for Directed Verdicts, are Equivalent to Jury Verdict and will not be Disturbed, if Supported by Any Evidence.**

2. Court's findings on fact questions, submitted to it by each party moving for directed verdict, are equivalent to verdict of jury, and hence will not be disturbed, if supported by any evidence.

**Appeal and Error—Evidence must be Viewed Most Favorably to Defendant, on Appeal from Judgment of Dismissal After Motions for Directed Verdicts.**

3. On appeal from judgment of dismissal, after motions for directed verdict by each party, evidence must be viewed in light most favorable to defendant.

**Bills and Notes—Whether Indorsement of Notes was Obtained Through Duress, by Threats to Send Maker to Penitentiary, Held Fact Question for Trial Court.**

4. Whether defendant's indorsement of notes sued on was obtained through duress, imposed by threats of chairman of board of port commissioners to send maker, who was defendant's brother-in-law, to penitentiary if something were not done to take care of shortage in his accounts as port treasurer, *held* a fact question for trial court.

---

1. Effect of motion for directed verdict by both parties, see note in 13 Ann. Cas. 372. See, also, 26 R. C. L. 1080.

Contracts—Generally, Contract cannot be Avoided for Duress on Third Person, With Certain Exceptions as in Case of Near Relative.

5. Generally, a contract cannot be avoided because of duress imposed on a third person, but there are exceptions, as where subject of duress is a near relative.

Contracts—What Constitutes "Duress" Depends Much on Means, Age, Sex, Mentality, Physical Condition and Circumstances.

6. What constitutes "duress" depends much on means employed, age, sex, mental characteristics, physical condition and surrounding circumstances.

Contracts—Near Relationship is of Secondary Importance on Question of Duress Imposed on Third Person.

7. Nearness of relationship is of secondary importance in determining whether duress was imposed on third person; question being whether party induced to act was coerced by wrongful pressure, though party threatened was no relation.

Bills and Notes—Whether Implied Threat to Indorser of Note to Send Maker to Penitentiary Constituted Duress Ultimately Depends on Whether It Deprived Indorser of Free Exercise of Will.

8. Ultimate question in determining whether implied threat to one indorsing notes that maker would be sent to penitentiary, if something were not done to take care of shortage in his accounts, constituted duress is whether it had effect of depriving indorser of free exercise of his will, in which case meeting of minds, an essential element of contract, would be lacking.

Contracts—Law Does not Favor Transaction Which Comes Dangerously Near Trading on Felony.

9. The law does not look with favor upon a transaction which comes dangerously near trading on a felony.

Bills and Notes—Indorser of Note, Executed by Husband of His Wife's Sister, Could Set Up Duress by Threat to Send Maker to Penitentiary, Though not Latter's Brother-in-law in Strict Legal Sense.

10. One indorsing note, executed by husband of his wife's sister, *held* entitled to make defense of duress by implied threat that maker would be sent to penitentiary, if something were not done to take care of shortage in his accounts as port treasurer; there being a family relationship, whether or not indorser was maker's brother-in-law in strict legal sense.

Municipal Corporations—Port Commissioners Accepting Note With Knowledge of Chairman's Threat to Maker, Held Bound by Chairman's Acts and Declarations, Though not Originally Authorized.

11. Port commissioners accepting note, indorsed by relative of maker for amount of latter's shortage in accounts as treasurer

---

5. See 9 R. C. L. 726.
8. See 9 R. C. L. 716,

of port, with knowledge of chairman's implied threat to send maker to penitentiary, if something were not done to take care of shortage, *held* bound by chairman's acts and declarations, whether authorized in first instance or not.

Agency, 2 C. J., p. 493, n. 55, p. 499, n. 94.
Appeal and Error, 4 C. J., p. 902, n. 12.
Contracts, 13 C. J., p. 402, n. 90, 91, 92, 94, 96, p. 404, n. 14, 15, 20, 21, 23 New.
Trial, 38 Cyc., p. 1583, n. 73, 74.

From Multnomah: J. U. CAMPBELL, Judge.

Department 2.

AFFIRMED.

For appellant there was a brief over the name of *Messrs. Botts & Winslow,* with an oral argument by *Mr. H. T. Botts.*

For respondent there was a brief and oral argument by *Mr. Will H. Masters.*

BELT, J.—This is an action to recover the amount alleged to be due upon two promissory notes, aggregating $4,407.34, executed December 20, 1921, by Frank A. Rowe and indorsed by the defendant. The defendant seeks to avoid payment on the ground of duress. At the conclusion of the testimony each party moved for a directed verdict. The right to a jury trial having thus been waived, the court found in favor of defendant and entered judgment dismissing the action. Plaintiff appeals.

1, 2. When each party moved for a directed verdict, they, in effect, stipulated that all questions of fact be submitted to the court for its decision. Its findings in reference thereto are, therefore, equivalent to the verdict of a jury. Hence, we are not concerned with the weight of the evidence, but whether there was any to support the findings of fact made by the trial court.

3–5. It appears from the record that Rowe, who operated a small bank at Nehalem in Tillamook County, had for several years served as treasurer for the Port of Nehalem. In 1921 the bank failed and it was discovered that Rowe had misappropriated several thousand dollars belonging to the plaintiff. Extended negotiations were had with Rowe by the commissioners of the Port, in an effort to secure a satisfactory adjustment of the shortage. On December 6, 1921, Tom Watt, chairman of the board of commissioners, went to Portland to consult with the defendant relative to the trouble in which Rowe was involved. Nicholson, who was in the employ of the Balfour Guthrie Company, thus relates the conversation which occurred:

"Mr. Watt came into the office and told me that he presumed I was aware of the condition which Mr. Frank Rowe, who is married to my wife's sister, was in. I told him that I was not. He said, 'Well, you know the bank has failed down there?' I said, 'Yes, I am aware of that,' and he said, 'You know that Frank Rowe has been Treasurer of the Port of Nehalem?' and I said I didn't know anything about it. Well, he went on to tell me that a shortage had occurred in the books, that they had a number of meetings, the Port Commission had had a number of meetings * * . Mr. Watt told me that Mr. Rowe was short in his Port account and that he had been trying to raise money through various sources; he had raised some through the Wheeler family, he had approached Dr. Rosenfelt, he had approached others, and the situation was serious; they had had a number of meetings at which Mr. Rowe was there attendant, and he went on to tell me—he told me that unless Rowe came across with the shortage they would send him over to the pen, and at this meeting I told him, I told Mr. Watt that he was aware of the condition Mrs. Rowe was in, and I begged him, if he didn't do anything

else, as a personal favor, to hold off in prosecution or any further action in connection with this case until the child was born. The child was expected within a week or ten days, and he paid no attention to this, and he told me that they had had several meetings of the Port with Rowe and Rowe had wept and cried on the stand, that he was making every effort to raise the funds, and he further emphasized the point again and again that if they did not get the funds they would prosecute and send him to the penitentiary; there was a shortage of several thousand dollars, and he was in bad shape all round.''

On December 16, 1921, Watt again went to Portland and consulted with the defendant. According to the latter's testimony, he stated:

''We are going to put him across if somebody doesn't come through and make that amount good.''

Defendant further testified, referring to this conversation, that:

''He (Watt) emphasized the fact that the Port were going to put him across repeatedly and distinctly, getting it into my mind that the Port were going to prosecute if they didn't get the money, and my condition was such at that time that I was practically a physical wreck. I felt then that something had to be done. I took Mrs. Nicholson into my confidence, and she became absolutely hysterical, and we had Mrs. Rowe in the house with us at the time, practically facing confinement, so the situation was, to say the least, very distressing.''

Mr. Watt, in reference to the first conversation, testified on cross-examination, in part, as follows:

''I went in to see him as a friend of his and a friend of Mr. Rowe's, trying to get this thing straightened out. There was a shortage there and all the Port of Nehalem wanted was the money or security, so I told him the story. Mr. Nicholson was

a very sick man when I told him. He didn't have any idea that Mr. Rowe was that kind of a man at all. So we talked this thing back and forth, and I told him this shortage had to be taken care of some way or the Port wouldn't have any option at all in the matter, they would have to submit the information to the District Attorney."

After these two conversations between defendant and Mr. Watt, Rowe again met with the commissioners of the Port of Nehalem and, according to his testimony, was given to understand that, if the shortage was not adjusted in a satisfactory way, he would be prosecuted and sent to the penitentiary. He says, in substance, that, at the direction of the commissioners, he called Nicholson on the telephone at Portland, informing him of the situation. Nicholson corroborates Rowe in this respect and states that, after receiving this message, he thereupon indorsed the notes and mailed them to the secretary of the board of commissioners. It is fair to state that there is much testimony in the record disputing Rowe relative to any direction given by members of the Port Commission concerning this telephone message. However, in determining the legal question under consideration, the evidence must be viewed in the light most favorable to the defendant and, for that reason, no attempt has been made to set forth evidence supporting plaintiff's contention.

We are of the opinion that there is testimony tending to show that the defendant was, at least by implication, given to understand that if he did not indorse the notes in question Rowe would be sent to the penitentiary. As a general rule a contract cannot be avoided because duress was imposed on a third person, but there are well-established exceptions, as stated in many of the authorities, where the subject

of duress is the "wife, husband, parent, child or other near relative": *Guinn* v. *Sumpter Valley Ry. Co.,* 63 Or. 368 (127 Pac. 987).   The doctrine has been extended to include grandmother, grandson, aunt and nephew, sister and brother, father or mother-in-law, son-in-law and brother-in-law: 9 R. C. L. 726. In one case a woman invoked it to avoid a contract by reason of duress practiced upon her intended husband: *Rau* v. *Von Zedlits,* 132 Mass. 164. For instructive discussion of the progress of the law of duress, see Elliott on Contracts, § 140.

6. It is urged by counsel for appellant that the relationship of the parties in this case is not sufficiently close to bring the defendant within the exception "near relative," as declared by this court in *Guinn* v. *Sumpter Valley Ry. Co., supra.*   That case was a suit instituted by a wife to cancel certain deeds whose execution and delivery were obtained through the threat to prosecute and imprison her husband on a criminal charge.   It was not intended to announce any fixed and inflexible rule to determine when the defense of duress would lie.   What would constitute duress in one case would not in another.   Much depends upon the means employed, the age, sex, mental characteristics, physical condition and surrounding circumstances.

7. The modern trend of authority is that the nearness of relationship is of secondary importance.   As stated in Williston on Contracts, Section 1621:

"It is obvious that under the modern definition of duress, there can be no question of the nearness of relationship; the question becomes merely one of whether the party induced to act was coerced by wrongful pressure, and the threat to kill or seriously assault a companion who is in no way related to the actor may evidently operate as such coercion."

122 Or.—34

In Black on Rescission and Cancellation, it is said:

"But it may be stated with some confidence that the general tendency is to lay less stress upon the degree of kinship between the parties affected, and more upon the actual effect of the threats made in exciting alarm, anxiety and distress in the mind of the person victimized."

8–10. The ultimate question, after all, to be determined is whether the implied threat made to defendant that Rowe would be sent to the penitentiary if something were not done to take care of the shortage had the effect of depriving him of the free exercise of his will. Did he indorse those notes voluntarily or was his consent to do so obtained through coercion? If, under all the circumstances, he was not in a position to exercise his will in the premises, then there was lacking one of the essential elements of a contract. There was no meeting of the minds. Primarily, the defendant was neither morally nor legally responsible for the debt of Rowe. While the commissioners of the Port were, no doubt, actuated by the best of motives in seeking to protect the fund, the law does not look with favor upon a transaction which comes dangerously near trading on a felony. In the light of the record, we are not prepared, as a matter of law, to say that defendant's indorsement of the notes was not obtained through duress. It was a question of fact which the court determined adversely to plaintiff and by its findings we are bound. It is immaterial whether the defendant, in a strict legal sense, was the brother-in-law of Rowe, the husband of Mrs. Nicholson's sister. In our opinion, there existed a family relationship and the conditions were such that he was entitled to make the defense interposed.

11. We consider untenable the contention that the plaintiff is not bound by the acts and declarations of Watt who, at the time, was chairman of the board of commissioners. Whether he was authorized in the first instance is immaterial in view of the fact that there is evidence tending to show that plaintiff knowingly accepted the fruits of his act. We take it that no authorities need be cited to support this elementary principle of agency.

The judgment of the lower court is affirmed.

AFFIRMED.

RAND, C. J., and BROWN and COSHOW, JJ., concur.