[No. 25966. Department Two. June 15, 1936.]

A. H. BAIR *et al., Respondents,* v. SPOKANE SAVINGS BANK *et al., Appellants.*[1]

[1]Reported in 58 P. (2d) 819.

*Robertson & Smith, Dillard & Powell,* and *Hart Snyder,* for appellants.

*D. V. Morthland, Harry L. Olson,* and *Lane Morthland,* for respondents.

BEALS, J.—For some time prior to June, 1928, one W. J. Burianek had been representing Spokane Savings & Loan Society as its agent in Yakima. J. L. Cooper and Boyd C. Walker were president and secretary, respectively, of the society. Burianek was the son-in-law of A. H. and Allie B. Bair, the plaintiffs in this action.

June 8, 1928, Messrs. Cooper and Walker, and a third man representing the company which had bonded Burianek as the society's agent, called at Burianek's office, and after examining his accounts, taxed him with a shortage of something over $9,700. The agent of the bonding company stated that, if they were called upon to make good any shortage, the matter would be placed before the prosecuting attorney. It is not denied that Burianek was, in fact, short in his accounts, and that he had embezzled funds belonging to the society in the amount claimed.

At this time, Mrs. Burianek, plaintiffs' daughter, was expecting the birth of her first child and was under a doctor's care, she experiencing some annoyance from pains in her back. On the evening of June 8th, plaintiffs were informed of the shortage by Burianek and his wife, and were told that, unless the matter was adjusted, Burianek would probably be ar-

rested. At this time, Mrs. Burianek was naturally greatly excited, and the possible effect upon her of her husband's arrest was naturally the cause of alarm to plaintiffs. Burianek suggested that plaintiffs execute with him a promissory note in favor of the society for the amount of the shortage, which plaintiffs, that evening, stated that they would do.

On the afternoon of Saturday, June 9th, Mr. Cooper and Burianek called on plaintiffs at their home. The testimony is in some conflict as to just what happened on that occasion. Defendants contend that the evidence shows beyond question that a note and mortgage were submitted to plaintiffs, who signed both instruments, together with a receipt. Plaintiffs strenuously deny that they signed any document save the mortgage. On the trial, Mr. Bair testified positively that he did not sign the paper referred to as a "receipt," which authorized the bank to pay the proceeds of the loan to Burianek.

It is difficult to understand how plaintiffs can seriously contend that they did not sign all three documents. The instruments are all in the record, handwriting experts testified on behalf of defendants, and it cannot be doubted that plaintiffs did sign the note, mortgage and receipt. Plaintiffs' testimony in connection with these matters demonstrates that, at the time of the trial, their recollection of what was said and done was extremely unreliable.

It clearly appears that plaintiffs expected to sign a note, and that, when the note and mortgage were submitted to them on Saturday afternoon, they objected only to signing the latter instrument, saying that they understood that they were to sign a note. Plaintiffs, however, finally did sign the note, payable three years from date, and the mortgage securing the same. Semiannual payments of interest were made during the

term of the mortgage, the payment for December, 1930, having been accompanied by a letter from Mr. Bair, calling attention to the fact that the loan would fall due in six months, and asking whether or not the same could be renewed. During the month of June, 1931, the loan was extended; plaintiffs executing an extension agreement specifically referring to the note and mortgage, and agreeing to pay the same, together with interest, on or before June 9, 1934.

The period within which Burianek could be prosecuted for his embezzlements expired prior to January 1, 1931. Plaintiffs continued to pay the semi-annual interest up to and including December 7, 1932, but in the spring of 1933 consulted an attorney, requesting his advice as to whether or not they were liable upon the note and mortgage.

During the month of January, 1934, plaintiffs instituted this action, praying that the note and mortgage be canceled, and asking that they be granted judgment for the amount of interest which they had paid, claiming that the note and mortgage had been signed under duress and that they should be judicially relieved from liability thereon. Meanwhile, the Spokane Savings & Loan Society had become the Spokane Savings Bank, which institution had been taken over by the state supervisor of banking. No claim demanding the return of the interest which they had paid had been filed by plaintiffs within the statutory period for the filing of claims against the insolvent bank.

Trial to the court resulted in a decree in plaintiffs' favor canceling the note and mortgage and granting judgment against the bank for the amount of the interest payments, together with six per cent interest thereon from the respective dates interest was paid. The bank's cross-complaint asking for judgment on the note and foreclosure of the mortgage was dis-

missed. From this decree, Spokane Savings Bank and the supervisor of banking, together with his deputy, have appealed.

Appellants assign error upon the ruling of the trial court canceling the note and the mortgage securing the same; upon the rendition of judgment against the bank for the amount of interest paid by respondents; and upon the dismissal of the cross-complaint asking for judgment on the note and foreclosure of the mortgage.

The evidence is voluminous and authorities are copiously cited. A detailed discussion of all phases of the case would extend this opinion to an unreasonable length.

It is easy to understand that respondents desired to protect their daughter, whose physical condition naturally excited their sympathy and afforded ground for the thought that any considerable shock might result in unfortunate and possibly serious consequences. It is admitted by all the witnesses that, when the parties were together on Saturday afternoon, Burianek, who was naturally nervous and disturbed, turned to Mr. Cooper and inquired, "If this is not signed I will be sent to jail?" or words to that effect. Respondents' witnesses testified that Mr. Cooper replied in the affirmative. Mr. Cooper testified that he made no answer to the question. Burianek then remarked, "I want that understood."

Respondents base their case upon the following propositions: (1) That the mortgage was executed by them under duress, and is for that reason null and void, or at least voidable, and that the same was never ratified; (2) that the duress continued for five years, or thereabouts, and until Mr. Bair consulted counsel; (3) that respondents had the right to, and did, rescind the mortgage and the note and recover back the interest payments which they had made thereon; (4) in

the alternative, that, if it should be determined that the mortgage was not void, or that the same has been ratified, it should be held that the consideration for the same was illegal and that the mortgage is void; (5) that the mortgage was entirely without consideration, and is for that reason void.

The trial court did not pass upon the question of the illegality of the contract between the parties as possibly based upon an agreement, express or implied, to suppress the prosecution of Burianek.

Respondents admit that they first learned that Burianek was in difficulties from him and their daughter; and that, before they had any consultation with anyone representing the bank, they had decided that they would sign with Burianek a note in the bank's favor. If respondents decided that, in order to assist their daughter, they would underwrite their son-in-law's indebtedness to the bank, they simply determined a matter of policy which was for them to decide, after consideration of all the circumstances, with which they were, of course, familiar.

Respondents are not ignorant and unsophisticated, but are people of education and experience. They themselves stood in no danger. It is not contended that they knew of, or profited to the least degree by, their son-in-law's peculations. Neither did their daughter stand in personal jeopardy. The only element which respondents argue constituted duress was the fact that their daughter was in delicate health, and that the arrest of her husband and her consequent worry and sorrow might have serious consequences. The basic fact that her husband was an embezzler was already known by the wife. As the result of the Friday evening's conversation between respondents and their daughter and her husband, respondents, before they had met any agent of the bank, stated that they

would sign a note with Burianek. Certainly, the bank applied no duress to bring about that understanding.

At the Saturday afternoon meeting, it is evident that Mr. Cooper, impliedly at least, indicated that Burianek would be arrested unless the bank was, in some manner, protected against loss. It does not appear, however, that he asked respondents to execute the documents, or that he engaged in any argument with respondents, or urged any course of conduct upon them. It is not contended that the sum agreed to be paid was any greater than that justly due the bank from Burianek; the bank seeking only to recoup its loss. The bank was protected by a bond. Of course, the record does not indicate the stand the bonding company would have on any claim against it.

While the amount which respondents agreed to pay is considerable, this is a matter which has little bearing upon the question to be determined. Many parents would cheerfully pay one hundred dollars to save a beloved daughter annoyance; others would pay one thousand dollars to accomplish the same result. The amount to be paid is merely one of the elements to be considered at the time by the parties concerned in determining what should be done, and in this case, at least, has little bearing upon the decision to be reached by the court.

In the case of *Cornwall v. Anderson,* 85 Wash. 369, 148 Pac. 1, this court stated that:

"Conceding that the liberal modern doctrine as to the true test of duress sufficient to avoid contracts otherwise valid is as stated by appellants, the rule as it now exists is that the question of duress is one of fact in the particular case, and it may exist whether the threat be sufficient or insufficient to overcome the mind of a man of ordinary courage."

In the late case of *Whitman Realty & Inv. Co. v. Day,* 161 Wash. 72, 296 Pac. 171, we said that duress

exists whenever one is induced by another "to make a contract under circumstances which deprive him of the exercise of his free will."

Respondents rely upon the case of *Delta County Bank v. McGranahan,* 37 Wash. 307, 79 Pac. 796. This was an action brought against a husband and wife upon promissory notes executed by them in Colorado. The wife defended upon the ground that she had signed the notes under duress consisting of threats to institute a criminal prosecution against her husband if certain property owned by her was not turned over to the plaintiff bank and the notes in suit executed. The husband pleaded his discharge in bankruptcy, with which defense we are not now concerned. The lower court decided the case in favor of the defendants, and upon appeal to this court, the judgment was affirmed. In the course of its opinion, this court said:

"That Mrs. McGranahan executed the notes in suit, and turned over to the appellant certain of her individual property, in payment of her husband's debts to avoid a criminal prosecution against her husband, is testified to, not only by herself and husband, but by the officers of the appellant also. The officers say that Mr. McGranahan, as president of the appellant bank, loaned himself large sums of money, which he was unable to repay; that the creditors of the bank believed the property claimed by Mrs. McGranahan was procured by some of this money so borrowed, and they insisted that the property be turned over to the bank, else McGranahan be prosecuted for having violated the criminal statutes of Colorado; that they communicated this fact to the respondents, and that the property was turned over accordingly; the notes being given in lieu of a mortgage the respondents had placed on the property. This, we think, taken with the testimony of the respondents, justifies the finding of duress made by the trial court, and warrants the judgment relieving Mrs. McGranahan from liability on the notes.

*Thompson v. Niggley,* 53 Kan. 664, 35 Pac. 290, 26 L. R. A. 803.''

It does not appear that the notes were given on account of money misappropriated by the husband, and that the threats of prosecution were based upon this wrongful act. If Mrs. McGranahan's signature to the notes was extorted through threats of prosecution of her husband for some offense having nothing to do with the indebtedness for which the notes were given, a good reason existed for holding that Mrs. McGranahan's defense should be sustained. It is also to be noted that the threat was against the defendant's husband, not, as here, against a defaulting son-in-law.

In the case of *Riney v. Doll,* 116 Kan. 26, 225 Pac. 1059, the supreme court of Kansas (while finding that no duress existed) said:

"When one uses the bludgeon of duress to break the will of his adversary and thereby gains a wrongful or unconscionable advantage, a court will relieve the victim of the consequences of the act he was thus forced to perform, whether his will be weak, requiring but one blow to shatter it, or whether it be of ordinary firmness, requiring several, or whether it be as adamant, requiring many.

"The courts now quite generally recognize the inaccuracy of defining duress by applying it to a person of ordinary firmness.''

Respondents argue that, where one party to a contract does not really consent thereto, but the other party obtains the formal consent of the resisting party to the undertaking by force or the exercise of undue influence, the free agency of the contracting party is destroyed and no contract, in fact, has been created (citing 13 C. J. 263; 6 R. C. L. 592; 9 R. C. L. 716, 717, 723, 726). This principle of law is correct.

In Ann. Cas. 1917C, p. 1026, it is stated in the note that, while the general rule is that the defense of duress

by threats of imprisonment must be sustained by proof of threats which create a reasonable fear of imprisonment of the person to whom the threats are made, an exception has been recognized in cases of threats to a parent of injury to his child. The authority cited, however, does not go so far as to state that the injury to the child may be incidental, as here, and may result merely from humiliation and chagrin at the arrest of the child's spouse, no direct threat against the child having been made.

Respondents also cite *Portland Cattle Loan Co. v. Featherly,* 74 Mont. 531, 241 Pac. 322; *Martin v. Evans,* 163 Ala. 657, 50 So. 997; *Port of Nehalem v. Nicholson,* 122 Ore. 523, 259 Pac. 900; and many other cases.

In the case of *Port of Nehalem v. Nicholson, supra,* it appeared that one Rowe had embezzled the port's money. The defendant Nicholson endorsed Rowe's note in favor of the port and later, in an action on the note, claimed duress. It appeared that the chairman of the port's board of commissioners called on Nicholson, who was Rowe's brother-in-law, and urged him to endorse Rowe's note, stating that, "unless Rowe came across with the shortage they would send him over to the pen." It is clear that the evidence showed a direct campaign by the port's officials against Nicholson, and the trial court having found that Nicholson had signed under duress, the supreme court on appeal affirmed the judgment. The facts are utterly dissimilar to those shown in the case at bar, as from respondent's own testimony it appears that no one on behalf of appellants threatened or even argued with respondents in an attempt to persuade them to assist their son-in-law.

In the case of *Portland Cattle Loan Co. v. Featherly, supra,* the supreme court of Montana held that the

plaintiff had exercised duress in procuring a mortgage from its creditor, his wife and son. It appears from the opinion that threats of prosecution were made to the defendant in the presence of the other mortgagors, the defendant being accused of a felony on account of an admitted indebtedness to the mortgagee. The court was of the opinion that the plaintiff had used the threat of criminal process in order to procure security for an indebtedness, and that unlawful duress had been exercised. The case is not here in point.

Appellants place considerable reliance upon three cases decided by this court: *Ingebrigt v. Seattle Taxicab & Transfer Co.*, 78 Wash. 433, 139 Pac. 188; *Cooley v. Davis*, 114 Wash. 196, 194 Pac. 968; *State v. Burns*, 161 Wash. 362, 297 Pac. 212, 1 P. (2d) 229. In the first two cases cited, it was held that certain acts did not constitute duress as between the person wronged and the wrongdoer. The *Burns* case involved a criminal prosecution based upon an alleged offense by way of extortion. While these cases differ from the case at bar, as argued by respondents, in that no duress was sought to be exercised upon a third party, the doctrine laid down by this court indicates that, in this jurisdiction, certain rules of law followed by some jurisdictions, applicable to cases involving duress, will not here be effective, and that the rule laid down by the supreme court of Maine, in the case of *Hilborn v. Bucknam*, 78 Me. 482, 7 Atl. 272, 57 Am. St. 816, will here prevail. In the case of *Thorn v. Pinkham*, 84 Me. 101, 24 Atl. 718, 30 Am. St. 335, the supreme court of Maine followed its earlier decision and held that a note signed by an embezzler and endorsed by his father and a relative was a valid obligation. In the course of its opinion, the court said:

"It is contended that the note was obtained by duress, and that the consideration was illegal. Suppose

the embezzler had been plainly told that, unless he paid or secured the amount that he had stolen, he would be prosecuted for the theft, and thereupon gave the note. That would not have been duress. 'It is not duress for one who believes that he has been wronged to threaten the wrong-doer with a civil suit. And if the wrong includes a violation of the criminal law, it is not duress to threaten him with a criminal prosecution.' *Hilborn v. Bucknam*, 78 Me. 485 [7 Atl. Rep. 272]."

In the case of *Englert v. Dale*, 25 N. D. 587, 142 N. W. 169, the supreme court of North Dakota upheld a mortgage executed by an aged woman, as she contended, because of threats that her son would be arrested.

As to the facts in the case at bar, Mr. Bair, when asked by his counsel as to what was said at the Saturday afternoon meeting, testified:

"Well, to tell you the truth, there wasn't very much said; it was just about like a funeral to me. Q. Well, what was done then? A. Well, Cooper handed me the mortgage and I was sitting at the end of the couch reading it and my wife was in the kitchen and I told her, 'Why, this is a mortgage,' and she came in and looked at it and said to Burianek, 'Why, Burianek, I thought this was to be a note.' He hemmed and hawed about it a little bit and we read it over a little and finally signed it. Q. Was there any conversation there before you signed this mortgage? A. Yes. Q. State what, if anything, was said about Burianek's embezzlement of any money? A. Well, Burianek says to Cooper, he says, 'You said that if I didn't get this settled right away that you would send me to jail?' And Cooper says, 'Yes,' and Burianek says, 'I want that understood.' Q. Was that before you signed the mortgage? A. Yes. Q. That occurred before you signed the mortgage? A. Yes, sure. Q. Then you signed the mortgage? A. Yes."

And later, in response to a question as to whether there was any other conversation, he answered:

"(Pausing) Well, we, my wife and I read it over, read a part of it anyway, and saw what it was, and I said to her I didn't know what to do, 'I don't know what to do about this; I guess the only thing is to sign it.'"

The witness later stated that the entire matter consumed no more than half an hour. It appears that Burianek told respondents that he himself would pay the money within a short time, and that Mr. Bair thought Burianek had some property and that he would, within a short time, relieve respondents of the obligation. This is important as bearing on respondents' motive in executing the note and mortgage. Mr. Bair stated, at the time his deposition was taken by appellants prior to the trial, in response to a question by appellants' counsel:

"Q. Well, just what did you say, then, when he asked you to sign this, to make a note for him? A. Why, I don't know what I did say; I suppose that I consented to it. Q. You don't remember, though, one way or the other just what the conversation was? A. No. Q. And did he have to urge you and argue with you quite a bit? A. No. Q. You did it as soon as he told you he was in a jam? A. Yes, I knew what would happen to the daughter, or I thought I did, if he was put in the pen or in the jail and that would probably happen to him."

Referring to the same occasion, Mrs. Bair testified:

"Q. Let's go back to the time when you were in the sitting room. What else was said, if anything, after Burianek put the question to Cooper and Cooper answered as you testified and Burianek said, 'I want that understood'? What was done or said after that? A. Well, it was awfully quiet, there was so little said. It was just as still as could be, nobody talked, and Mr. Bair had this paper in his hand and said, 'I don't know what to do, I don't know what to do about this,' and nothing was said, just as quiet as could be; everybody was quiet and —"

We are unable to find anything in the record before us which justifies a holding that respondents acted under duress and should consequently be relieved from their obligation. The burden of proof rested heavily upon them to prove facts which would justify the court in granting them the relief which they asked. This is not a case where a party in the position of the bank threatened to take action which would bring home to a wife the knowledge that her husband had stolen his employer's money. That knowledge Mrs. Burianek already had. While his arrest and imprisonment would, of course, cause her additional grief, the greatest shock must have been the fact that he had for some time been an embezzler.

Respondents evidently decided, after such thought and consideration as they desired to give the matter, and certainly after hours of deliberation, that they would assume a certain liability to the bank, in order to save their daughter some further sorrow and humiliation. Mr. Bair testified that, before the Saturday afternoon meeting, he was satisfied that Burianek would go to jail unless something was done. The conversation above quoted was merely confirmatory of what respondents already knew.

In any event, we would unhesitatingly hold that respondents, by their acts in paying repeated installments of interest and in asking for and receiving an extension of the loan, after full knowledge of all the facts was in their possession, ratified the loan and placed themselves in a position in which they cannot disaffirm the same. Mr. Bair testified that, in the spring of 1933, he was one day out in the orchard trimming brush and

" . . . the thing came to me all of a sudden, 'You don't have to pay this mortgage, there is something wrong.' Q. You hadn't had any conversation recently with anybody — A. (Interrupting) Oh, no. Q. —

which caused you to come to that conclusion? A. No, sir. Q. You hadn't discovered any facts of any sort which led you to that belief? A. Other than some of the things they didn't [sic] do to get the mortgage. Q. Just a minute. What I say is, at that time or shortly before that you hadn't been informed of any particular facts bearing upon this case, had you? A. No, I don't think so; no. Q. Then what did you do after you had this 'inspiration,' I guess we can call it? A. All right, sir, that's right;''

and, later,

''Well, there must have been something wrong or I wouldn't have had this hunch that there was something wrong;''

also,

''Q. Referring to the note and the mortgage; for instance, Plaintiff's Exhibit 'A' and Defendant's Exhibit '12', respectively, now just compare those signatures there and state whether or not they are in your opinion exact. (Handing said Exhibits 'A' and '12' to witness.) You say they are exactly the same. Now, they are not exactly the same. Just compare them, your signature in each of those instruments. In other words, the one is not a tracing. MR. MORTHLAND: Let's get the others (handing Plaintiff's Exhibit 'B' to witness). A. We never did see them. I never saw — this thing is the biggest lie I ever saw in my life. I never heard of that until in Spokane; no. (Referring to Plaintiff's Exhibit 'B'). Q. Compare those signatures and tell me whether one is an exact copy of the other (referring to Exhibits 'A' and '12'). A. (Comparing signatures on note and mortgage) This appears to be up a little more there, the 'B'; this is down a little. This is a little different, too. Oh, that thing there, I never did see (referring to Plaintiff's Exhibit 'B'). Q. As a matter of fact, those are not exact copies, one of the other? A. Probably they wouldn't be. Why can't an expert tell anything about it? Q. An expert is going to in a little while; he's right here in the court room. A. This thing is the outstanding thing in the answer

to my hunch. That thing right there (indicating Plaintiff's Exhibit 'B'), because that's impossible. It is entirely impossible because it is a lie in the first place. We never did see it.''

Mrs. Bair testified:

''Q. What did Mr. Bair tell you, then, when he came in that day, Mrs. Bair? A. He said — of course we often talked about this thing — and he said, 'Well, we don't have to pay it,' and I said, 'Why, don't we have to pay it?' 'No,' he says, 'we don't have to pay it; there's just something wrong.' 'Well,' I says, 'I always thought there was something wrong.' Q. And, so far as you know, you hadn't discovered any new facts recently in connection with the matter, had you? A. Recently? Q. I mean just immediately preceding that, nobody had said anything to you about the case or you hadn't found out anything about it except what Mr. Bair told you? A. No, no. Q. Now, you said you and Mr. Bair had talked about it frequently and that you always had thought there was something wrong with it. When you say you had always thought there was something wrong in it, do you mean something wrong in the way you had been required to sign it by duress? A. Yes. Q. And by force? A. Yes. Q. You always thought — A. (Interrupting) — they took advantage. Q. I see. When did you first have that feeling about it? A. At the time. Q. You mean right at the time you were signing it? A. Yes, sir. Q. And you had that idea all the time afterwards? A. All the time, yes. Q. At the time Mr. Burianek came out to see you in the evening before the mortgage and note were signed— or the mortgage was signed—you expected then that he would in a short time take care of that and repay you, did you not? A. We did. Q. And relieve you of the obligation? A. Yes. Q. And that was your understanding shortly after or immediately after you had signed it, was it not? A. Yes, sir. Q. And you were doing it then merely as a temporary accommodation to him, to help him out temporarily; was that it? A. Well, yes. Q. Or help your daughter? A. Yes. Q. Until he could arrange somewhere else to raise the money; is that correct? A. Yes.''

The following cases are in point in this connection: *Walla Walla Fire Ins. Co. v. Spencer*, 52 Wash. 369, 100 Pac. 741; *Duke v. Force*, 120 Wash. 599, 208 Pac. 67, 23 A. L. R. 1354; *Webb v. Lothrop*, 224 Mass. 103, 112 N. E. 934; *Rosenbloom v. Kaplan*, 273 Mass. 411, 173 N. E. 522; *Augusta Motor Sales Co. v. King*, 36 Ga. App. 541, 137 S. E. 102; *Eash v. Pence*, 121 Okla. 7, 246 Pac. 1091; *Oregon Pac. R. Co. v. Forrest*, 128 N. Y. 83, 28 N. E. 137; *Guinn v. Sumpter Valley R. Co.*, 63 Ore. 368, 127 Pac. 987; *Dispeau v. First Nat. Bank*, 24 R. I. 508, 53 Atl. 868; *Bushnell v. Loomis*, 234 Mo. 371, 137 S. W. 257, 36 L. R. A. (N. S.) 1029; *Greenpoint Nat. Bank v. Gilbert*, 237 N. Y. 19, 142 N. E. 338; *Eberstein v. Willets*, 134 Ill. 101, 24 N. E. 967; *Loud v. Hamilton*, 51 S. W. (Tenn. Ch. App.) 140; *Farmers' State Bank v. Day*, 226 S. W. (Mo.) 595; *Barnette v. Wells Fargo etc. Bank*, 270 U. S. 438, 46 S. Ct. 326, 70 L. Ed. 669; *Myers v. Grey*, 122 N. Y. S. 1079.

In view of our determination upon the basic question involved, further discussion upon this phase of the case is unnecessary.

Respondents suggest that the evidence shows that the bank was careless in its dealings with Burianek. This may, to some extent, be true, but has no bearing on the issues here to be decided.

█ We find no reason for holding that the consideration for the execution of the note and mortgage was illegal or that there was no or a grossly inadequate consideration therefor. Save for some testimony by Burianek, denied by other testimony, it does not appear that respondents submitted any evidence tending to prove that any bargain was made not to prosecute their son-in-law. They may well have believed that no prosecution would be instituted, but no agreement to that effect was made with respondents by anyone on behalf of or representing appellants. We deem

Burianek's testimony unworthy of credence. It clearly appears that Burianek was bonded, and that appellants, upon receipt of the note and mortgage in question, made no attempt to enforce restitution by the bonding company, which company would undoubtedly have placed the matter before the prosecuting attorney had it been compelled to make good Burianek's shortages.

It clearly appears from the evidence that respondents, without any pressure brought to bear upon them by the bank's officials or agents, made up their minds to sign the note which Burianek wanted them to sign. While, at the meeting on Saturday, respondents hesitated, naturally enough, before signing the mortgage, they did sign it without any inducements, threats or promises on behalf of the bank. The evidence above quoted as to the statement by Burianek in Mr. Cooper's presence, assuming that the latter acquiesced therein, by no stretch of the imagination can be held to constitute duress or a threat obnoxious to the law. After the execution of the note and mortgage, respondents paid interest thereon for years, and requested and received an extension thereof, making further payments of interest thereafter. The effect of any influence on the part of the bank certainly expired almost immediately after the execution of the documents. Under no circumstances could it be held that any supposed duress continued long after that date.

We find no possible theory upon which respondents can prevail in this action. The decree appealed from is reversed, with instructions to the trial court to deny respondents the relief prayed for and proceed to grant appellants the relief demanded in their cross-complaint.

BLAKE, MAIN, and HOLCOMB, JJ., concur.

MILLARD, C. J. (dissenting)—The mortgage was procured under duress. The judgment should be affirmed.