[No. 26652. Department Two. October 15, 1937.]

INVESTMENT AND SECURITIES COMPANY, *Appellant,* v. CHARLES ELY ADAMS *et al., Respondents.*[1]

[1]Reported in 72 P. (2d) 288.

42

*Witherspoon, Yantes, Witherspoon & Kelley,* for appellant.

*Gleeson & Gleeson,* for respondents.

Robinson, J.—This action to foreclose a mortgage was brought by Investment and Securities Co., a corporation, in the process of liquidating certain assets of the Old National Bank and Union Trust Company of Spokane.

■ The respondents have moved to dismiss the appeal, on the ground that the bond is insufficient to give jurisdiction. It is conditioned both as a cost and supersedeas bond, and the penalty is but two hundred dollars. The argument in support of the motion is that, since some portion of that amount must be allocated to the supersedeas, the cost bond is necessarily for a lesser amount than the two hundred dollars required by Rem. Rev. Stat., § 1722 [P. C. § 7296].

In 1915, the legislature enacted Rem. Rev. Stat., § 1730-9 [P. C. § 7297], which provides as follows:

"When a notice of appeal to the supreme court shall have been served and filed in due time and an appeal bond shall have been given within the time required by law, no appeal shall be dismissed because of any defect in the appeal bond, nor because an appeal bond which is given both as a cost bond and as a bond on supersedeas shall be insufficient by reason of the amount, but the appellant shall in all cases be allowed to give a new bond within such time and upon such terms as the court may order."

It is clear that, if the penalty of the bond were $200.01 instead of $200, the respondents' argument would wholly fail, and the appropriate remedy would not be a motion to dismiss, but a motion to require the appellant to furnish a new bond. We think the bond given is merely "insufficient by reason of the amount," within the meaning of the statute quoted, and, since the statute says "no appeal shall be dismissed because of any defect in the appeal bond," the motion to dismiss is denied.

■ The respondents also move to strike the statement of facts, on the ground that it was not timely filed and served. This motion is also denied. It must have been made through some inadvertence, since the record clearly shows that the judgment was entered on December 29, 1936; the motion for new trial denied

as of January 9, 1937; and the statement of facts was served and filed on March 1, 1937.

The facts in this case are somewhat unusual. In 1929, respondent Charles Adams opened an account with the Old National Bank. On December 31, 1931, to preserve his credit with the bank, he made a statement of his assets and liabilities, in which he represented there were no accounts payable to relatives or friends. On June 20, 1932, he deposited with the bank, as collateral security for a loan of $250, four certificates, each for ten shares of the capital stock of the New World Life Insurance Company. The value of these shares at the time, and also at the time of trial, was $280. On August 18, 1933, he signed three thirty-day notes, payable to the Old National Bank, one for $857.58, one for $600, each bearing interest at eight per cent per annum from maturity, and the third for $250, bearing interest at seven per cent per annum from maturity.

In the autumn of 1933, the appellant took over certain assets of the Old National Bank for liquidation, and, among them, these notes. One of appellant's officers, Mr. Stilson, wrote to Charles Adams demanding payment. Adams appeared at appellant's office in January, 1934. He was unable to pay anything on the notes.

Mr. Stilson told Adams that he had noted that, on December 20, 1933, a mortgage had been filed in the records of Spokane county, executed by Adams in favor of his brother, B. B. Adams, covering a parcel of Spokane real estate, said mortgage purporting to have been made on April 27, 1933, to secure a note of even date for $3,525. Stilson also told Adams that he suspected that this mortgage was fraudulent, and that, if it were not released and a mortgage given to his principal to secure the indebtedness evidenced by the

notes, he would file a petition in bankruptcy in an endeavor to set the mortgage aside. Adams left, saying that he would talk the matter over with his brother.

After several subsequent interviews between Stilson and Charles Adams, B. B. Adams released his mortgage. Charles Adams gave a note to appellant dated February 15, 1934, promising to pay $250 on February 15, 1935, a like sum on February 15, 1936, $317.50 on February 15, 1937, 1938, 1939, and $311.30 on February 15, 1940, amounting in all to the sum of $1,763.80, with interest at seven per cent per annum until due, payable annually. This amount represented the aggregate of the three notes made on August 18, 1933, plus a small amount of interest accrued after maturity. The note provided that, in case of default in the payment of any instalment of principal or interest, the entire balance should become immediately due and payable. It was secured by a mortgage on the same real estate covered by the mortgage previously given by the maker to his brother B. B. Adams. The mortgage, although dated February 15, 1934, appears to have been acknowledged and delivered to the respondent, together with a release of the B. B. Adams mortgage, on February 23, 1934.

The respondent Charles Adams did not make the first payment stipulated in the note on February 15, 1935, or the second due on February 15, 1936; nor did he comply with the covenant of the mortgage requiring the payment of general taxes. On June 17, 1936, about two years and four months after the receipt of the note and mortgage, the plaintiff-appellant declared the entire indebtedness due and payable and brought this suit to foreclose.

In October, 1936, the defendant Charles Adams answered, setting up, in substance, that he gave his brother B. B. Adams a mortgage upon the same prop-

erty in April, 1933, to secure the repayment of a loan of $3,525; that, previous to February 15, 1934, defendant owed plaintiff an accumulated sum of $1,769.40; that, at and previous to that time, his brother B. B. Adams was in failing health, in need of physical care, and wholly without earning power, and that he himself had no gainful occupation and was without any means to care for his brother; that he was the owner of forty shares of New World Life Insurance Company stock, worth $280 at that time and also at the time of trial; that this stock had been pledged to the plaintiff to secure a portion of his indebtedness; that, sometime previous to February 15, 1934, it was agreed between plaintiff and defendant that defendant should obtain a release of the mortgage of B. B. Adams and then make a mortgage to plaintiff to secure his indebtedness, and that the plaintiff, upon the execution of these papers, would return the old notes and would surrender the stock to the defendant so that the same could be reduced to cash to relieve the necessities of his brother and himself; and that, relying upon the representation of the plaintiff that it would deliver the notes and the stock, the defendant did secure the release and make the mortgage.

Defendant further alleged that the representation of the plaintiff that it would return the stock was false and untrue and fraudulently made for the purpose of wrongfully obtaining the mortgage and defrauding and cheating B. B. Adams out of his mortgage, and prayed that B. B. Adams be allowed to become a cross-complainant, that plaintiff's mortgage be cancelled, and that the mortgage of B. B. Adams be restored of record. B. B. Adams was allowed to become a defendant and cross-complainant, and, as such, he set up substantially the same allegations as contained in his

brother's answer and prayed that his mortgage be restored.

At the trial, Charles Adams testified that it was a part of the agreement that he was to receive the old notes and the certificates of stock upon the delivery of the mortgage and his brother's release; that he asked for them when he delivered the mortgage and the release on February 23rd and was told that he could not have them until the mortgage was recorded; that Stilson promised to surrender the stock a week later, but, instead of so doing, demanded that he sign an agreement hypothecating it, which he refused to do. Stilson denied that there was any agreement to give up the stock, or that anything was said about so doing. This constitutes the only substantial dispute of fact in the case.

Whatever the truth may be about the matter, it is certain that Adams knew, as early as March 13, 1934, that he was not going to get the stock, for he admits receiving from the plaintiff the following letter of that date:

"Dear Mr. Adams:

"In connection with the renewal note and real estate mortgage, which you have given us covering your indebtedness, it is understood that in consideration of this real estate security that we will agree that as long as payments called for by the real estate note and mortgage are made as due, we will not dispose of the forty shares of New World Life Insurance Company stock which we also hold as collateral to the indebtedness, unless instructed by you to do so."

The following letter of April 28, 1934, taken in connection with Stilson's testimony that Adams never did anything more about the matter, explains the appellant's failure to surrender the old notes:

"Dear Mr. Adams:

"The Reconstruction Finance Corporation has returned to us your notes which were renewed by the

mortgage and we are now in a position to return these to you.

"It will be necessary for you to execute and return to us the hypothecation agreement that was given you at the time of your last visit and the transaction will then be completed until payments come due under the mortgage."

Adams did not again call at the appellant's office, or reply to this letter, or return the hypothecation agreement.

 It is apparent that the respondents assumed a very heavy burden in attempting to cancel the mortgage on the ground of fraud in its inception. They had known all the facts alleged to constitute the fraud for more than two and one-half years. Such a long delay would ordinarily bar an action for cancellation. The trial court excused it on the ground that the respondents did not have the funds to bring an action.

While we agree with almost all of the court's findings, including the finding that the mortgage given by Charles Adams to B. B. Adams was perfectly valid, we are unable to determine the exact theory upon which the trial court's decision decreeing the cancellation of the plaintiff's mortgage and the restoration of the B. B. Adams mortgage is based.

 There is considerable in the record, though not in the findings, to indicate that the trial court thought the mortgage void on the ground that it was procured by duress, and that B. B. Adams released his mortgage under duress. But the appellant never had any direct contact with B. B. Adams, and it can scarcely be maintained that Charles Adams was its agent.

Even if he was, or even if appellant had directly told both brothers that, unless B. B. Adams released his mortgage, the appellant would bring an action in bankruptcy for the purpose of setting it aside, this would

not have constituted duress warranting the cancellation of the one mortgage and restoring the other, either under the general authorities, 13 C. J. 399, 9 R. C. L. 722, or our own decisions, *Cornwall v. Anderson,* 85 Wash. 369, 148 Pac. 1; *Gardner v. Herbert,* 165 Wash. 429, 5 P. (2d) 782; *Bair v. Spokane Savings Bank,* 186 Wash. 472, 58 P. (2d) 819. Appellant's vice-president did no more than threaten to employ a somewhat drastic civil remedy, and, while his ultimatum to Charles Adams may seem harsh, it must be remembered that he was acting for the benefit of the depositors of a suspended bank, some of whom were, doubtless, also in necessitous circumstances.

There is nothing in the findings to the effect that the appellant was guilty of fraud. The court did find, and,—since the evidence was quite evenly balanced and he saw and heard the witnesses, we accept the finding,—that Stilson did promise to surrender the certificates of stock. But that in itself does not show fraud, but merely the breach of a collateral promise. There is no finding or intimation that the court regarded the promise as made as a means of deceit and made with no intention to perform, and there is no evidence in the record from which such a finding could have been made. We are not at liberty to infer from the fact that delivery of the stock was refused, that there was a preconceived intention not to perform. *Hewett v. Dole,* 69 Wash. 163, 124 Pac. 374.

The court found, among other things,

" . . . that there was no consideration whatsoever for making and delivering the mortgage and note described in plaintiff's complaint for the sum of $1763.80,"

and concluded that "said mortgage should be cancelled of record." Neither the finding nor the conclusion is justified. There was, in fact, a consideration. Charles

Adams owed the amount for which the mortgage was given. It was represented by three notes then due and immediately payable. One of these for $857.58, and another for $600, bore eight per cent interest. In consideration of the giving of the mortgage, Adams secured the privilege of paying the amount he owed in instalments over a period of six years, with a full year in which to make the first payment, and his interest rate was lowered to seven per cent.

The mortgage could not be cancelled on account of appellant's failure to deliver the New World Life Insurance Company stock. The following rule, quoted from 4 R. C. L. 500, is well-established by the decisions of other courts as well as our own:

"Moreover, in the absence of fraud, a deed or lease of real estate will not be set aside as for a failure of consideration, on the sole ground that the promises and agreements which entered into its execution and were to be performed *in futuro* have not been performed. Equity will not interfere where a grantor has seen fit to accept a verbal promise on the part of his grantee for the performance of certain acts without specifically providing that failure to perform should be a condition of forfeiture or in any way affect the validity of the deed or entitle him to a reconveyance."

See, also, *Hewett v. Dole,* 69 Wash. 163, 124 Pac. 374; *Cleveland v. Herron,* 102 Ohio St. 218, 131 N. E. 489; *Rouss v. Rouss,* 90 W. Va. 646, 111 S. E. 586.

The finding that the appellant promised to surrender the New World Life Insurance Company stock cannot possibly be regarded as a finding that the promise was a condition or term of the mortgage, because that instrument cannot be added to by parol. A breach of that promise can therefore in no way be held to affect the validity of the mortgage, although it would support a cause of action for the delivery of the stock or the recovery of its value.

The judgment appealed from is reversed, and the trial court directed to enter a decree foreclosing the mortgage in accordance with the prayer of the complaint; but, in view of the fact that the case is in equity and the respondents prayed for such further, other and different relief as to the court might seem just, the trial court is further directed to order the delivery to the respondent Charles Adams of the certificates for the forty shares of New World Life Insurance Company stock, the same now being in the custody of the court as defendants' exhibits 7, 8, 9, and 10, and to award him an offset against the appellant for the amount of the dividends, if any, that the appellant may have received upon the stock since February 23, 1934.

STEINERT, C. J., MAIN, HOLCOMB, and BEALS, JJ., concur.

